Perry MOSS, Jr., and Rosalind E. Moss, Plaintiffs–Appellants,

v.

OLE SOUTH REAL ESTATE, INC., et al., Defendants–Appellees.

Perry MOSS, Jr., and Rosalind E. Moss, Plaintiffs–Appellees,

v.

OLE SOUTH REAL ESTATE, INC., et al., Defendants–Appellants.

Nos. 90–1113, 90–1162.

United States Court of Appeals, Fifth Circuit.

June 26, 1991.

Robert W. Smith and Patti C. Golden, Biloxi, Miss., Martha G. Carson, D'Iberville, Miss., for plaintiffs-appellants.

Gail A. Crowell, James N. Compton, Compton, Crowell & Hewitt, Biloxi, Miss., for Ole South & Zelma Wixey.

Donald C. Dornan, Jr., Biloxi, Miss., for Henry D. Wixey d/b/a Ole South.

Ronald G. Peresich, Tere R. Richardson, Biloxi, Miss., Fielding L. Wright, Pascagoula, Miss., for Kwikway & Lawrence.

Before JOHNSON, WILLIAMS and HIGGINBOTHAM, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

After an unsuccessful attempt to purchase a home in the front of a suburban subdivision, Perry and Rosalind Moss, a black couple, sued Ole South Real Estate, Inc.; Kwikway, Inc.; Henry D. Wixey, d/b/a Ole South Real Estate; Zelma Douglas; Ole South Real Estate, Inc.; and Harold Lawrence for allegedly violating 42 U.S.C. §§ 1981, 1982, and 1985 (1988). Magistrate Britt R. Singletary excluded some of the Mosses' evidence and directed verdicts in favor of defendants Zelma Douglas and Harold Lawrence in their individual capacities. The jury found in favor of the remaining defendants. The magistrate denied the defendants' motions for attorney's fees. Both sides appeal.

## I. FACTS AND PRIOR PROCEEDINGS

In April 1985, Perry Moss, a captain in the United States Air Force, and Rosalind Moss tried to buy a home in Gulfport, Mississippi. The black couple enlisted the help of Lorraine Santo, a real estate agent. Santo showed them a home at the front of a suburban subdivision named Colonial Estates.

The home had a list price of $63,000. Kwikway, Inc. owned the house and used it as a model home and sales office for the other houses it owned in Colonial Estates. Henry Wixey, doing business as Ole South Real Estate (Ole South), was Kwikway's exclusive broker on the model home. Zelma Douglas (former wife of Henry Wixey) was the Ole South sales agent who dealt with the Mosses. The Mosses made offers of $60,000 and $61,000 on the model home. Harold Lawrence, president and sole shareholder of Kwikway, rejected both offers. The Mosses also made an offer on another house, which Lawrence rejected. As he did in all negotiations with the Mosses, Lawrence refused to negotiate the price. The Mosses' agent suggested that she and Ole South cut their commission so that the second house would sell. Zelma Douglas and Henry Wixey rejected the suggestion.

Two racial statements were allegedly made during negotiations in late April 1985. Robbie Boomgaarden, a sales agent employed by Ole South, allegedly told the Mosses' real estate agent, Santo, that "they don't want niggers living at the front of the subdivision because it makes the rest of the homes harder to sell and lowers prices." As one of Ole South's sales agents, Boomgaarden helped man the model home on behalf of Kwikway. She did not show the Mosses the model home and was not directly involved in any negotiations with the Mosses. Henry Wixey and other witnesses admitted that Robbie Boomgaarden was prone to racially derogatory remarks. Santo told the Mosses about Boomgaarden's alleged statement after all of their offers had been rejected.

The other racial statement was allegedly made by Henry Wixey to Janis Pittman, Santo's broker.[1] Witnesses testified that during a telephone conversation on the sec-

---

[1] This statement was allegedly made a few days after Perry Moss contacted the Air Force and HUD about possible discrimination by the defendants.

ond house, Henry Wixey told Janis Pittman to "take your nigger captain somewhere else or sell him $500 more house." The defendants denied that either of the statements was made.

After Santo told him about Robbie Boomgaarden's statement, Perry Moss filed complaints of racial discrimination with the Department of Housing and Urban Development (HUD) and the Air Force. Both organizations investigated. HUD determined that the evidence was inconclusive and did not issue a charge of discrimination. The Air Force investigator concluded that no discrimination had occurred, but a panel reviewing his findings found that Henry Wixey, Ole South, and Robbie Boomgaarden had discriminated. The Air Force prohibited members of the Department of Defense from conducting business with the three parties for 180 days. The Air Force found no discrimination by Harold Lawrence or Kwikway.

In September 1985, a hurricane hit Gulfport, Mississippi, and subsequently the strength of the area's real estate market declined. In addition, most of the homes in the subdivision had sold, and the model home was thus less important. Kwikway had a loan on the model home due in January 1986.

On October 23, 1985, Zelma Douglas incorporated Ole South as Ole South Real Estate, Inc. and began serving as its president. Until October 23, 1985, Ole South was structured as Henry Wixey's sole proprietorship. When Henry Wixey and Zelma Douglas divorced in January 1985, Zelma Douglas was awarded the business, and Henry Wixey agreed to remain as Zelma Douglas' broker until she got her own license. According to the rules and regulations of the Mississippi Real Estate Commission, brokers are responsible for the acts of their sales agents.

In early November 1985, a white couple expressed interest in the model home. The home was still listed at $63,000; the white couple first offered $58,000. Instead of refusing to negotiate his price, as he had done in all negotiations with the Mosses, Lawrence countered with an offer of $59,-000 which the couple accepted. Additionally, Harold Lawrence told Zelma Douglas to cut Ole South Real Estate, Inc.'s commission from six percent to four percent, a step which she and Henry Wixey had been unwilling to take during negotiations with the Mosses on the second house. Because Ole South Real Estate, Inc. was both the listing and selling agent on this sale, it did not have to share the commission with another agent, as it would have had to do on a sale to the Mosses. On November 6, 1985, the white couple signed a contract on the home. On November 7, 1985, Henry Wixey removed his brokerage license from the wall of Ole South and Zelma Douglas got her own license. The sale was completed in December of 1985. Henry Wixey received no financial benefit from the sale and had nothing to do with the transaction.

When Perry Moss learned that the house had been sold to a white couple for a price less than the one he had offered, he asked HUD to reopen its investigation. A HUD investigator, Cynthia Johnson, told Perry Moss how to do so after she visited the Air Force base on other business and learned of the Mosses' situation. In response to Perry Moss' request, HUD reopened the investigation and assigned Johnson the case. HUD's second report found evidence of a pattern and practice of racial discrimination by Zelma Douglas, Ole South Real Estate, Inc., Harold Lawrence, and Kwikway. The report was approved by Johnson's supervisor, the HUD Title VII branch chief, the compliance division director, and the director of the HUD regional office. Due to an inquiry from Congressman Trent Lott, HUD regional counsel reviewed the file and stood by the report's conclusions.

In October 1987, the Mosses brought this action under 42 U.S.C. §§ 1981, 1982, and 1985 (1988). The parties agreed to litigate the case before magistrate Singletary. All defendants filed motions in limine to exclude the HUD and Air Force reports from evidence. The magistrate granted the motions and also excluded Johnson's deposition and the testimony of an Air Force official. At trial, the magistrate directed verdicts in favor of Zelma Douglas and

Harold Lawrence in their individual capacities and instructed the jury that Robbie Boomgaarden was not an agent of Kwikway. The jury returned a verdict for all remaining defendants. The magistrate denied the Mosses' motion for a new trial and the defendants' motions for attorney's fees. Both sides appeal.

## II. DISCUSSION

### A. EVIDENTIARY RULINGS

#### 1. Rule 803(8)(C)

The Mosses first appeal the magistrate's exclusion of HUD's report and the Air Force's report under Federal Rule of Evidence 803(8)(C). The reports are clearly hearsay. Fed.R.Evid. 801. Hearsay is generally inadmissible, Fed.R.Evid. 802, because oath, personal appearance at trial, and cross-examination are the best mechanisms to ensure truthful and accurate testimony. Nevertheless, some classes of hearsay are excluded from Rule 802's prohibition against the admissibility of hearsay.

Rule 803 excludes certain types of statements from the hearsay ban even though the declarant is available as a witness, primarily because "under certain circumstances, a statement, although it is hearsay, may still possess circumstantial guarantees of trustworthiness sufficient to justify its admission as evidence." *Rock v. Huffco Gas & Oil Co.*, 922 F.2d 272, 280 (5th Cir.1991). Rule 803(8) excludes from the hearsay rule certain public records and reports. The Advisory Committee notes that "[j]ustification for the exception is the assumption that a public official will perform his duty properly and the unlikelihood that he will remember details independently of the record." *See also Bradford Trust Co. v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 805 F.2d 49, 54 (2d Cir.1986) (Rule 803(8) "is premised on the assumption that public officials perform their duties properly without motive or interest other than to submit accurate and fair reports.").

 Rule 803(8)(C) covers evaluative reports and provides in relevant part:

(8) Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (C) in civil actions and proceedings ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

Opinions and conclusions, as well as facts, are covered by Rule 803(8)(C). *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169, 109 S.Ct. 439, 450, 102 L.Ed.2d 445 (1988). The Advisory Committee "assumes admissibility [of 803(8)(C) reports] in the first instance." Thus, evaluative reports are presumed not to be excluded under the hearsay rule unless there are indications of untrustworthiness. If the reports are untrustworthy, they are inadmissible.

The Advisory Committee proposed a non-exclusive list of four factors which are helpful in determining trustworthiness: (1) the timeliness of the investigation; (2) the special skill or expertise of the official; (3) whether a hearing was held and at what level; and (4) possible motivational problems as in *Palmer v. Hoffman*, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943) (holding that the railroad's version of events, embodied in the company's records, was inadmissible hearsay because the report was not part of the systematic conduct of a railroad business).

In light of the presumption of admissibility, the party opposing the admission of the report must prove the report's untrustworthiness. *See Bradford Trust Co.*, 805 F.2d at 54; *Ellis v. International Playtex, Inc.*, 745 F.2d 292, 301 (4th Cir.1984); *Kehm v. Procter & Gamble Mfg. Co.*, 724 F.2d 613, 618 (8th Cir.1983); *Baker v. Elcona Homes Corp.*, 588 F.2d 551, 558 (6th Cir.1978), *cert. denied*, 441 U.S. 933, 99 S.Ct. 2054, 60 L.Ed.2d 661 (1979).

We review the magistrate's decision to exclude both the Air Force report and the HUD report for abuse of discretion. *Koonce v. Quaker Safety Prods. & Mfg. Co.*, 798 F.2d 700, 720 (5th Cir.1986). When a trial court's evidentiary ruling is based solely on the resolution of a legal

issue, however, our standard is *de novo*. *Nachtsheim v. Beech Aircraft Corp.*, 847 F.2d 1261, 1266 (7th Cir.1988); *United States v. Pecora*, 798 F.2d 614, 626 (3d Cir.1986), *cert. denied*, 479 U.S. 1064, 107 S.Ct. 949, 93 L.Ed.2d 998 (1987). We will reverse only when a substantial right is affected. *Rock*, 922 F.2d at 277.

■ The magistrate issued a written opinion stating his reasons for excluding the two reports. He relied partly on the factors suggested by the Advisory Committee but also relied on other factors. As for the Air Force report, the magistrate conceded that the report was timely because the investigation occurred shortly after the incident, that all parties charged were notified and interviewed, and that a hearing was held. Thus, the first and third factors in the Advisory Committee Notes were met. He then found, however, that major allegations rested on hearsay evidence, that irrelevant evidence was in the file, that there was no indication of the skill of the Air Force investigators, and that the Air Force officials relied on biased witnesses. He also noted conflicts among Air Force officials and between Captain Moss and Air Force investigators.

The magistrate noted several reasons to exclude the HUD report. He found the report untimely because the investigation began in October 1986.[2] The Mosses attempted to buy a home in Colonial Estates in April 1985, and the model home they wanted was sold in December 1985.

The magistrate noted that the circumstances prompting the second investigation were "somewhat irregular." Johnson, a HUD investigator, was at the Air Force base on an unrelated matter when an Air Force official mentioned the Mosses' original claim filed with HUD and the sale of the home to a white couple after the completion of the first HUD investigation. The Air Force official, familiar with the facts of the Mosses' claim, set up the interview. Johnson then advised Perry Moss on how to reopen the investigation. Johnson

was assigned the investigation. The magistrate found that Johnson's objectivity may have been tainted because she interviewed Perry Moss before being assigned to investigate.

The magistrate also found the investigation itself inadequate because Johnson did not interview some witnesses who were previously interviewed, relying instead on their earlier statements, and because there was no formal hearing or cross-examination of witnesses. For these reasons, the magistrate concluded that the investigation was not exhaustive or thorough.

In addition, the magistrate reviewed the report and file. He noted that exhibits in the file were inadmissible before a court, that findings were incomplete and misleading, and that witnesses relied upon were biased. He noted that although there were questions as to whether Henry Wixey made racial statements, Johnson concluded that he had.

After carefully reviewing the entire record and the magistrate's ruling excluding the two reports, we are left with the definite and firm conviction that the magistrate abused his discretion in excluding the two reports. The magistrate applied a flawed legal analysis which transcended discretion. *See In re Japanese Elec. Prods.*, 723 F.2d 238, 265 (3d Cir.1983), *rev'd on other grounds*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("[A] determination of untrustworthiness, if predicated on factors properly extraneous to such a determination, would be an error of law."). The magistrate did not limit himself to determining whether the reports were trustworthy. Instead he made several determinations that witnesses in the reports were not credible, and as a result the reports were not *credible* and therefore were untrustworthy. Credibility is not the focus of the trustworthiness inquiry.

The magistrate looked broadly at credibility in ruling on both reports. For example, the magistrate found that the HUD report's resolution of certain disputed facts

2. The file was apparently reopened in October 1986. According to the HUD file, Johnson began the investigation January 19, 1987, and completed the investigation April 10, 1987. The report is dated April 24, 1987.

was incorrect and that "many of the findings appear to be incomplete and misleading as they fail to consider all the relevant evidence." Whether a conclusion is correct and whether the bases for that conclusion are complete and accurate are issues of credibility. He also found that the Air Force and HUD relied on "biased" witnesses. Again, this is an issue of credibility—whether certain witnesses are believable and accurate.[3]

■ In making determinations of credibility, the magistrate overstepped his role. The court must allow the jury to make credibility decisions and to decide what weight to afford a report's findings. The magistrate's complaints are similar to the ones addressed in *Matador Drilling Co. v. Post,* 662 F.2d 1190, 1199 (5th Cir.1981). In that case we noted that the appellant's "general complaint that the reports are incomplete and inaccurate are matters going to the weight of this evidence and not its admissibility." *See also Crompton Richmond Co., Factors v. Briggs,* 560 F.2d 1195, 1202 n. 12 (5th Cir.1977) ("Although [appellant] does not contest the admissibility of this evidence, his attack is essentially one arguing its inaccuracy and incompleteness.... [T]his is an assault on its weight, not on its admissibility. Of course, the weight accorded to such records is within the domain of the trier of fact.") In making the trustworthiness determination required by Rule 803, courts should not focus on questions regarding the accuracy or completeness of the document's conclusions.[4]

■ It follows that in determining trustworthiness under Rule 803(8)(C), credibility of the report itself or the testimony in the report are not the focus. Instead the focus is the report's *reliability.* As the Supreme Court stated in *Beech Aircraft,* "[t]his trustworthiness inquiry—and not an arbitrary distinction between 'fact' and 'opinion'—was the Committee's primary safeguard against the admission of *unreliable* evidence." 488 U.S. at 167, 109 S.Ct. at 448. (emphasis added.) The Rule 803 trustworthiness requirement, therefore, means that the trial court is to determine primarily whether the report was compiled or prepared in a way that indicates that its conclusions can be relied upon ("reliability"). The four factors suggested by the Advisory Committee correctly focus attention on the preparation of the report, *see Nachtsheim,* 847 F.2d at 1272–73 (relying on 4 J. Weinstein & M. Berger, *Weinstein's Evidence* at 803–234 to 803–235 (1991)), not on whether the court agrees with the conclusions of the report.[5]

The above analysis with its focus on reliability has clearly been the significant inquiry in this Court's approach to trustworthiness under Rule 803. *See United States v. Duncan,* 919 F.2d 981, 986 (5th Cir.1990) (" 'the primary emphasis of rule 803(6) is on the reliability or trustworthiness of the records sought to be introduced' ") (quoting *United States v. Veytia–Bravo,* 603 F.2d 1187, 1189 (5th Cir.1979), *cert. denied,* 444 U.S. 1024, 100 S.Ct. 686, 62 L.Ed.2d 658 (1980)); *Herdman v. Smith,* 707 F.2d 839, 842 (5th Cir.1983) (equating trustworthiness with reliability).[6] We have held that

---

**3.** We do not suggest that bias may never render a report unreliable under Rule 803(8)(C). In this case, however, from reading the magistrate's ruling, we are also left with the opinion that he either disagreed with the conclusions of the Air Force and HUD or did not think that evaluative reports should generally be admissible. Neither reason is within a court's discretion.

**4.** In unusual circumstances, a report's conclusions and inaccuracy can reveal untrustworthiness. *See infra* note 5.

**5.** Of course, a court should not completely ignore an 803(8)(C) report's conclusions. If reasonable jurors could not accept the report's con-

clusions, then there would be no reason to admit the report. There must be, in other words, some reasonable basis for the conclusions. The absence of some reasonable basis will, however, be unusual because of the nature of the reports covered by Rule 803(8)(C). The two reports before us do not have such a problem. The conclusions are supported by reasonable factual findings and reasonable jurors could accept the conclusions.

**6.** Other Circuit Courts have also noted that the trustworthy inquiry under Rule 803 is concerned essentially with reliability, and that credibility questions are reserved for the jury. *Nachtsheim,* 847 F.2d at 1272; *Bradford Trust Co.,* 805 F.2d at 54; *Ellis,* 745 F.2d at 304.

reliability focuses on the methodology behind the report. *See Broadcast Music, Inc. v. Xanthas, Inc.*, 855 F.2d 233, 238–39 (5th Cir.1988) (looking at reliability in the processes of compiling the evidence in determining whether evidence is trustworthy); *United States v. Puente*, 826 F.2d 1415, 1418 (5th Cir.1987) (affirming trial court's conclusion that document was reliable and therefore admissible; noting that circumstances under which information was recorded did not indicate that the document was unreliable). Further, reliability is not a matter of credibility. *See generally Rock*, 922 F.2d at 280–81 (trial court properly did not consider credibility in making its determination of trustworthiness); *United States v. Tafoya*, 757 F.2d 1522, 1529 (5th Cir.) (noting that although a business record is trustworthy, the parties could still argue to the jury that the record was not credible), *cert. denied*, 474 U.S. 921, 106 S.Ct. 252, 88 L.Ed.2d 259 (1985).

Thus, while Rule 803 is concerned with hearsay and hearsay is excluded because of the general distrust of out-of-court declarants, Congress has ruled that there is a presumption that this distrust should generally not apply to public officials doing their legal duties. Evaluative reports generally *do not* have the four problems associated with most hearsay—problems of memory, perception, ability to communicate, and sincerity. Whether evaluative reports do in fact have these hearsay dangers is most often a question of methodology, not a question of credibility.

We recognize, of course, that courts must nonetheless insure that juries do not abdicate their fact finding duties to government officials who prepare the reports. This concern, however, is true for all trials in which experts testify as to their opinions. To remedy the problem, the court must carefully instruct the jury that it is the sole judge of the facts and need not accept the conclusions of a report.

### 2. Rule 403

The magistrate also excluded the reports under Rule 403 because he concluded that if they were admitted they would so con-

fuse the jury that their probative value would be substantially outweighed. He found that admitting the second HUD report would confuse the issues because the defendants would attack the credibility of the HUD investigator, Johnson. Such an attack, although relevant, would improperly cloud the issues before the jury. The magistrate noted that

> [t]he critical issue to be decided is whether Moss was racially discriminated against in his efforts to purchase a home. The agencies who investigated the incident are not parties to the present litigation nor are their procedures on trial. Clearly, this is a significant reason to exclude all the reports in question so as to avoid such problems and ensure the jury remains focused on the merits of the case.

The magistrate's analysis fails. His approach would exclude all evaluative reports because the competence and trustworthiness of the investigator is always relevant. *Cf. Ellis*, 745 F.2d at 304–05. Exclusion of such reports is clearly contrary to Rule 803(8)(C). Further, the magistrate seemed to demand that authors of evaluative reports be parties in a case. Yet, this is seldom true. Also, the magistrate expressed a fear that the jury would give the reports too much weight in its decision, a problem which he found a jury instruction could not cure. Again, this analysis would gut the admissibility of evaluative reports under Rule 803(8)(C) because his analysis would be true for all evaluative reports. The trial court's use of Rule 403 would end the presumption that evaluative reports are admissible hearsay under Rule 803(8)(C).

The only legitimate possible basis of concern of the magistrate was jury confusion. The magistrate found that the jury would be confused because the first and second HUD reports reached different conclusions and because the Air Force investigator and review panel reached different conclusions. Standing alone this must be insufficient to exclude evidence under Rule 403. The second HUD report reached a different conclusion because of the subse-

quent sale for a price less than the Mosses' two offers and because Robbie Boomgaarden admitted in the second investigation that she made racially derogatory remarks. These are simple facts that a jury can easily grasp. As for the differences within the Air Force, officials' having differing opinions is common in thorough investigations of complex issues. Voicing differences of opinions during an investigation is a way to reach the truth and is not discouraged by the Federal Rules of Evidence. The jury is free to weigh the fact of and reasons for conflicting reports.

### 3. Substantial Right

■ Although we rule that the magistrate abused his discretion in his analysis resulting in the exclusion of the two reports, this does not end our inquiry. We reverse on the basis of erroneous evidentiary rulings only if a substantial right is violated. " 'It is not for us to decide that the effect of what was excluded might not have altered the jury's views.... (I)f there is a reasonable likelihood that a substantial right was affected, we should not find the error harmless.' " *Muzyka v. Remington Arms Co.*, 774 F.2d 1309, 1313 (5th Cir.1985) (quoting *Johnson v. William C. Ellis & Sons Iron Works, Inc.*, 609 F.2d 820, 823 (5th Cir.1980)). We hold that there is a reasonable likelihood that the exclusion of the two reports might well have affected the substantial rights of the Mosses at trial. This is a case involving an issue not easily proved—racial discrimination during negotiations over a home in the front of a suburban subdivision. The factual findings of the Air Force and HUD, done pursuant to a legal duty to investigate, were relevant and were not merely cumulative. They represent a significant part of the Mosses' undertaking to prove individual discrimination and also proof of a *pattern* of discrimination by those charged.

### 4. Should the Reports Be Admitted?

We turn finally to the issue of whether one or both of the reports should have been admitted under Rule 803(8)(C). Because this is an issue of law and the relevant facts are undisputed, we address the issue.[7] Our first inquiry is whether under proper analytical considerations the Air Force report should have been admitted. The comprehensive investigation began within days of the alleged discrimination and the final report was issued within three months. All parties charged were interviewed, and a hearing was held.

■ The defendants assert three problems with the Air Force report: that there were conflicts within the Air Force over the case, that Perry Moss had conflicts with the Air Force, and that the Air Force investigators relied on hearsay evidence. All are common occurrences in difficult investigations and do not mean that the preparation of the report was untrustworthy. The fact that Perry Moss disagreed with the Air Force at times suggests in fact that the Air Force was independent, not that the report is untrustworthy. In addition, many government reports, as with many expert witnesses, have to rely in part on hearsay evidence, and the reports are

7. We must decide whether the reports should be admitted on remand also because the Mosses' remaining points on appeal would become harmless if the two reports should not have been admitted. The Mosses' other points are that the court should not have directed verdicts in favor of Harold Lawrence and Zelma Douglas in their individual capacities and should not have instructed the jury that Robbie Boomgaarden was not the agent of Kwikway, Inc. Any errors in the jury instructions and in the directed verdict would become harmless if the reports were both properly excluded. The original jury, which did not have either of the reports before it, found no discrimination by Henry Wixey, doing business as Ole South Real Estate; Ole South Real Estate, Inc.; or Kwikway, Inc. If the court correctly excluded the reports, there would be no reason to reverse for a new trial for the individual liability of Harold Lawrence and Zelma Douglas because the original jury found no evidence of discrimination by their respective corporations for which they were acting. Likewise, if the reports should not be admitted, then the issue of whether the court incorrectly instructed the jury that Robbie Boomgaarden was not the agent of Kwikway, Inc. becomes irrelevant. The error would be harmless. The jury was instructed that Robbie Boomgaarden was the agent of Ole South Real Estate and Henry Wixey and still did not find that the two discriminated.

not generally excluded for this reason. Under Rule 703, experts are allowed to rely on evidence inadmissible in court in reaching their conclusions. There is no reason that government officials preparing reports do not have the same latitude. The defendants have failed to prove that the report is untrustworthy.[8] Nevertheless, as set out below, the court on remand need not admit the entire investigatory file.

■ We must also consider under proper legal requirements whether the second HUD report should be admitted. This is a harder question than is the admissibility of the Air Force report. We find, after thorough consideration, that the defendants have proved that the HUD report is untrustworthy.[9] Most important, the investigation and report were untimely. According to the file, Johnson began the investigation in January 1987, and completed it in mid-April 1987. The report is dated April 24, 1987—two years after the alleged discrimination in negotiations and sixteen months after the subsequent sale to the white couple. Recollections become highly suspect over such a long period of time. Furthermore, Johnson did not interview a key player, Henry Wixey. By that time, Henry Wixey had no connection with the real estate business. He was still an important witness, however, because of his strong connection with the negotiations with the Mosses. For these reasons, we hold that the second HUD report was untrustworthy and should not have been admitted. We do not hold that Johnson had improper motivational problems, the fourth factor in the Advisory Committee Notes. The fact that she spoke to Perry Moss before being assigned his case does not prove that she was not a neutral public official performing her duty. But other factors stated above require the conclusion of inadmissibility.

### 5. Admitting Portions of the Reports

The magistrate seemed to approach the question of whether to admit the reports as an all or nothing proposition. One of the reasons he gave for excluding the reports is that the files contained inadmissible evidence. On remand, the court need not admit the entire Air Force investigatory file under Rule 803(8)(C).

■ Rule 803(8)(C) by its terms allows only the introduction of the report setting forth factual findings; there is no provision for requiring the admission of an entire investigatory file. On remand, the trial court need only admit the factual findings, including opinions and conclusions, of the Air Force report. *See Beech Aircraft,* 488 U.S. at 169, 109 S.Ct. at 450. It should not admit any portion of the investigatory file which contains otherwise inadmissible evidence.

### 6. Admission of Testimony of HUD and Air Force Investigators

■ The magistrate did not admit the deposition testimony of the HUD investigator, Johnson, or the live testimony of the Air Force investigator, Jean Smallman. The magistrate stated that he considered the testimony a backdoor attempt to get the two untrustworthy reports before the jury, which would undermine his exclusion of the two reports. He also found Johnson's deposition cumulative and untrustworthy. The Mosses proffered the deposition of Johnson. They made no proffer of Smallman's testimony because the magistrate refused to hear the proffer.[10] There-

---

**8.** The magistrate noted that the skill of the Air Force officials had not been indicated. This fact does not go against admissibility. The defendants had the burden to prove the lack of the investigators' skill.

**9.** The Mosses did not tender Johnson as an expert witness under Federal Rule of Evidence 702. We therefore do not reach the issue of whether the HUD report was admissible under Federal Rule 703. *See generally Nachtsheim,* 847 F.2d at 1270–71; *Lewis v. Rego Co.,* 757 F.2d

66, 73–74 (3d Cir.1985); *Paddack v. Dave Christensen, Inc.,* 745 F.2d 1254, 1262–63 (9th Cir. 1984); *Barrel of Fun, Inc. v. State Farm Fire & Casualty Co.,* 739 F.2d 1028, 1033 (5th Cir.1984).

**10.** The following exchange took place:
MR. SMITH [Mosses' counsel]: ... [W]hen we do have a convenient break, I'd like to make a record, still out of the presence of the jury, with regard to the United States Air Force file and how it was put together. She has no—

fore, the absence of a proffer cannot be held against the Mosses.

 The magistrate used a misguided approach in excluding the testimony of Smallman and the deposition of Johnson. Trustworthiness or reliability is not an issue in deciding whether to admit witnesses' testimony. Competency is the focus; and Johnson and Smallman are clearly competent under Rules 601 through 606. The concern that the witnesses' testimony would undermine the exclusion of the two reports should have been met in the court's ruling on the defendants' motions in limine. For example, the court could have simply ruled that no witness could refer to the existence or the conclusions of a government investigation.

 On retrial, the testimony of Smallman and Johnson is admissible unless other grounds of valid objection are raised. Since the Air Force report will be admitted, Smallman may properly testify about the compilation of the Air Force report. Such testimony is critical for the defendants to attack the credibility of the Air Force report. In light of the fact that the Air Force report should have been admitted, the exclusion of the testimony of Smallman is plain error.

 Even though the HUD report was properly excluded, parts of Johnson's deposition should have been admitted. The relevant parts of Johnson's deposition, i.e. not the sections involving her investigatory technique or the results of her investigation, primarily addressed what individuals told her about the case. These quoted statements in Johnson's deposition are a classic example of hearsay within hearsay. Both levels of hearsay must conform to a hearsay exception to be admissible. *See* Fed.R.Evid. 805. The first level of hearsay consists of Johnson's statements as to what people told her. These statements are hearsay because the declarant, Johnson, who is not available as a witness,[11] made the statements outside of the courtroom, and because the statements are offered to prove the truth of the matters asserted. Fed.R.Evid. 801. Johnson's statements, however, are excluded from the application of the hearsay rule under Rule 804(b)(1) because she is unavailable as a witness. Rule 804(b)(1) provides:

(b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness.

(1) Former Testimony. Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

 The second level of hearsay consists of the statements made by other

---

THE COURT: Do we have a quarrel about the authenticity of the file?

MR. SMITH: No, your Honor. We have a quarrel about the trustworthiness and procedural—

THE COURT: Okay. Well, I'm going to exclude that because I didn't have that information in making my ruling, so I'm not going to let the Fifth Circuit have it in making theirs. They'll have the record I had before me, and that's all.

MR. SMITH: Well, I would like to make a proffer of Ms. Smallman's testimony that I would have—

THE COURT: Okay. You can make it outside my presence.

MR. SMITH: That will be fine, your Honor. I wanted to make a proffer of what I would have presented at trial for your Honor's ruling on the United States Air Force file. I'll be

happy to do that at any time I'm allowed to do that.

THE COURT: All right. That's between you and Jennifer [apparently the court reporter], whenever y'all want to get together and do that.

A court must hear a party's proffer. Only with an understanding of the content of the evidence can a court properly decide how to rule on admissibility. Rule 103 requires an offer of proof partly so that a court is aware of the issue before it, thus enabling the judge to take appropriate action. *See generally* 21 C. Wright & K. Graham, Federal Practice and Procedure § 5041 (1977).

**11.** Johnson is unavailable as a witness because she is outside the court's subpoena power. Fed. R.Evid. 804(a)(4).

persons to Johnson. These statements are generally inadmissible as hearsay, even though they were reported in the Johnson deposition, because they are statements made outside the courtroom and are. offered to prove the truth of the matter asserted. *See* Fed.R.Evid. 801, 802. If parties to the lawsuit or agents of the parties made the statements, however, the statements are not within the definition of hearsay and are admissible against the parties. Fed.R.Evid. 801(d)(2).

The defendants can still argue that such statements are inadmissible under other evidence rules, i.e., the statements may be irrelevant, cumulative, or unduly prejudicial. We properly leave these determinations to the trial court.

## B. DIRECTED VERDICT

The magistrate directed verdicts in favor of Harold Lawrence and Zelma Douglas in their individual capacities. The magistrate did so because he found that all of their acts were done on behalf of their respective corporations.

■■■ This is an incorrect interpretation of personal and corporate liability. It is well settled law that when corporate officers directly participate in or authorize the commission of a wrongful act, even if the act is done on behalf of the corporation, they may be personally liable. *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 173 (5th Cir.1985). If the jury finds that Harold Lawrence or Zelma Douglas directly participated in discrimination or authorized discrimination, they may be held personally liable. The Mosses can still recover from the corporation, which as a separate legal entity can be held responsible for the wrongs of its agents. In short, plaintiffs can recover against both corporate officers in their individual capacities and either corporate officers in their corporate capacities or the corporations if the corporate officers are directly involved in a wrongful act. We reverse the granting of directed verdicts in favor of Harold Lawrence and Zelma Douglas in their individual capacities.

## C. AGENCY

■■■ The magistrate instructed the jury that Robbie Boomgaarden was not an agent of Kwikway, Inc., apparently because Robbie Boomgaarden was not involved in negotiations with the Mosses. This was error. Kwikway, Inc. employed Henry Wixey, doing business as Ole South Real Estate, as its exclusive broker for sales of its homes in Colonial Estates. Thus, Henry Wixey and Ole South Real Estate were the agents of Kwikway. *Smith v. H.C. Bailey Cos.*, 477 So.2d 224, 235 (Miss.1985) ("A real estate listing creates an agency relationship between the broker and the owner."). Kwikway clearly had the necessary right of control over Henry Wixey and Ole South Real Estate so that the two were its agents.

Further, anyone employed by Ole South in the ordinary course of performing its duties to Kwikway is also an agent of Kwikway, unless the parties agree otherwise. This is black letter law as exemplified in the Restatement (Second) of Agency § 5, illustration 5 ("P employs A, a real estate broker, to sell Blackacre. A employs salesmen to show the premises to prospective customers and to indicate the terms of sale. The salesmen are servants of A but not of P, although they are sub-agents of P."). Through its control of Henry Wixey and Ole South Real Estate, Kwikway also had control over the employees of Ole South Real Estate who performed their duties for Kwikway's benefit.

■■■ Robbie Boomgaarden was not involved in negotiations with the Mosses. Nor did she show the Mosses the model home, although one of her duties as an employee of Ole South Real Estate was to man the model home, which Kwikway owned and built. She did, however, answer questions about the home and show the home to others. By performing this duty, she benefited Kwikway and became its agent. Robbie Boomgaarden was still the agent of her employer, Ole South, and her broker, Henry Wixey.[12] Her conduct could

---

**12.** Robbie Boomgaarden was fired before Zelma Douglas became a broker and before Zelma

be evidence of a pattern or practice of discrimination. Since she said *"they* don't want niggers ...," her statement is also evidence of her principal's intent toward the Mosses.

Holding that Robbie Boomgaarden was an agent of Kwikway does not end our inquiry. Kwikway still may not be liable to third parties for Robbie Boomgaarden's statements if she overstepped the boundaries of her authority. This issue is usually a fact question for the jury and was not addressed in the record. It must be on retrial.

### D. ATTORNEY'S FEES

Defendants appeal the magistrate's denial of their motions for attorney's fees. Because this case is reversed and remanded for a new trial, the defendants have not prevailed. Therefore, they are not entitled to attorney's fees under 42 U.S.C. § 1988 (1988) at this stage of litigation.

### III. CONCLUSION

We REVERSE and REMAND for a new trial with instructions. The Air Force report should have been admitted. The HUD report, on the other hand, was properly excluded. The testimony of Smallman and Johnson should generally have been admitted; part of their testimony may nevertheless still be excluded according to routine application of the Rules of Evidence. Additionally, the jury was improperly instructed as to the agency relationship between Robbie Boomgaarden and Kwikway, Inc. Robbie Boomgaarden is the agent of Kwikway, Inc., although the corporation may not be liable for her acts. On remand, the court must make the necessary rulings on the issue of Kwikway's liability for her statements. Further, the magistrate improperly ruled that corporate officers cannot have individual liability for acts done on behalf of the corporation. If plaintiffs prove an actionable wrong, they can recover against both the individual corporate officer and the corporation itself when the individual was directly involved in the wrongful act.

Harold Lawrence and Zelma Douglas should be reinstated as parties in their individual capacities.

REVERSED AND REMANDED FOR A NEW TRIAL.

---

Douglas incorporated the business. No one alleged that she was the agent of Henry Law-rence, individually; Zelma Douglas, individually; or Ole South Real Estate, Inc.