954 F.2d 1081
 22 Fed.R.Serv.3d 149
 GENERAL MOTORS ACCEPTANCE CORPORATION, Plaintiff-Appellant,
v.
Charlie BATES, Benjamin Fulkerson, Sr. and Benjamin
Fulkerson, Jr., Defendants-Appellees.
GENERAL MOTORS ACCEPTANCE CORPORATION, Plaintiff-Appellant,
v.
CHARLIE BATES CHEVROLET-BUICK, INC., Defendant,
Benjamin Fulkerson, Sr., Defendant-Appellee.
 Nos. 90-1684, 91-1134
 
 Summary Calendars.
 United States Court of Appeals,
Fifth Circuit.
 March 4, 1992.
 Jess H. Dickinson, Vaughn & Dickinson, Gulfport, Miss., Nolan C. Leake, R. Byron Attridge, King & Spalding, Atlanta, Ga., for GMAC.
 Fred A. Ross, Jr., Jackson, Miss., Charles E. Hamilton, III, Galen S. Brown, Lamothe, Hamilton & Odom, New Orleans, La., for defendants-appellees.
 Appeals from the United States District Court For the Southern District of Mississippi.
 Before POLITZ, Chief Judge, KING and EMILIO M. GARZA, Circuit Judges.
 POLITZ, Chief Judge:
 
 
 1
 General Motors Acceptance Corporation appeals the grant of directed verdicts in favor of the defendants in their individual capacities and the imposition of Rule 11 sanctions. For the reasons assigned we reverse both rulings and remand for a new trial.
 
 Background
 
 2
 Early in 1985 Benjamin C. Fulkerson, Sr. decided to purchase an automobile dealership. Lacking experience in the auto business he engaged the assistance of Charles Bates, a former service manager of an auto dealership in Slidell, Louisiana. In March of 1985 Fulkerson and Bates bought a General Motors dealership in Picayune, Mississippi and incorporated it as Charlie Bates Chevrolet-Buick, Inc. Fulkerson owned 51% of the stock and served as a director and Secretary-Treasurer. Bates was "President" and "Dealer-Operator."
 
 
 3
 Bates Chevrolet was in part financed through a $400,000 note at Whitney National Bank. The note was in the name of Bates Chevrolet but was personally guaranteed by Fulkerson and Bates. On May 16, 1985 Bates applied for a GM franchise. The franchise application made no mention of Fulkerson or the fact that he was the majority stockholder and primary investor in the dealership. Instead, the application wrongfully stated that Jack McNeil, the prior owner of the dealership, would continue as the co-owner. In addition, Fulkerson and Bates misstated the financial condition of Bates Chevrolet by concealing the fact that the company had borrowed $400,000 to finance the purchase of the dealership. Fulkerson eventually disclosed his financial interest in the dealership after securing the franchise but he failed to reveal the $400,000 indebtedness.
 
 
 4
 Bates Chevrolet financed its inventory of vehicles under a General Motors Corporation Installment Sales Finance Agreement ("Financing Agreement"). The Financing Agreement required Bates Chevrolet to pay GM for each vehicle when sold to a customer.[1] Failure to make such payments constitutes a default under the Financing Agreement; such a sale is known as a "sale out of trust." As the servicing agent for GM under the Financing Agreement, GMAC automatically acquired GM's rights upon a default of Bates Chevrolet.
 
 
 5
 Bates Chevrolet made a profit of $160,000 in 1985 and $65,000 in 1986. By early 1987, however, Bates Chevrolet began experiencing severe financial problems. The company's operating expenses were too high and the dealership had excessive inventory. Although GMAC made periodic audit and inventory checks to assure compliance with the payment terms in the Financing Agreement, Bates Chevrolet was able to hide their financial difficulties by the temporary transfer of cash into the company at audit times. Immediately before a floorplan check Fulkerson would infuse funds into Bates Chevrolet to make it appear that the company was in a position to pay GMAC for the cars that had been sold. That money was withdrawn immediately after the audits.
 
 
 6
 On June 23, 1987 Bates Chevrolet was forced to borrow an additional $100,000 from the Whitney Bank. Fulkerson and Bates personally guaranteed this note. Realizing that the business could not continue as it had, Fulkerson began examining his options, including speaking with three potential buyers. He was not successful in reaching an agreement to sell the dealership. By December of 1987 Fulkerson decided that something had to be done immediately to stop further losses.
 
 
 7
 At this point the evidence diverges. GMAC contends that Fulkerson devised a scheme to sell the inventory, repay the $500,000 in dealership notes at the Whitney Bank that he had personally guaranteed, and then cease operations, leaving GMAC holding the bag. Fulkerson contends that he had decided to reorganize the dealership. His reorganization plan included firing Bates, who still owned 10% of the dealership, hiring new management, and selling off a large amount of the excessive inventory.
 
 
 8
 The record reflects the following scenario. On December 16, 1987 Fulkerson obtained a personal loan from the St. Tammany National Bank in Slidell for $50,000. He deposited this money into Bates Chevrolet so that GMAC would find all cars either paid or accounted for during its floorplan check on December 17. On December 17 Fulkerson and Bates extended the Whitney Bank obligations until June 17, 1988.
 
 
 9
 On December 18 Fulkerson instructed the dealership's office manager to stop paying GMAC for any vehicles sold for cash. Between the 18th and 22nd of December the dealership sold 13 vehicles. Bates Chevrolet did not pay GMAC for any of these cars.
 
 
 10
 On December 26 Fulkerson authorized his son, Benjamin C. Fulkerson, II to transfer Bates Chevrolet's used cars to Fulkerson Motors of Slidell, Louisiana, a used car business owned by the son which had been closed for two months.[2] Fulkerson contends that this was done because the vehicles might sell better in Slidell. Although Bates Chevrolet had given over $53,000 on trade-in allowances for these cars, they were sold to the son for only $525. Fulkerson insists that this was not a true sale, but was only a paper transaction to assure that when the vehicles were transferred to the Slidell lot they would be covered under the Fulkerson Motors insurance policy.
 
 
 11
 On December 28, 1987 Fulkerson directed the dealership's office manager to write him a check for $50,194.49 which was used to pay the recent loan from St. Tammany Bank. Had Bates Chevrolet paid GMAC for the cars that were sold the dealership would not have had the funds to cover this check.
 
 
 12
 On that same day Fulkerson told Bates to sell 11 new vehicles to a used car auctioneer in Baton Rouge. These vehicles were sold for $4,000 under dealer invoice. The nearly $100,000 received from this sale was not paid to GMAC but instead was deposited in the dealership's secondary checking account.[3] Despite the fact that the notes at the Whitney Bank had just been renewed for six months, Fulkerson also instructed the office manager to prepare a check to the Whitney Bank for $100,000 in payment on the notes.
 
 
 13
 On December 31, 1987 Fulkerson sold 28 more vehicles for $4,000 under dealer invoice. This sale, arranged through Fulkerson's son, netted $220,500. Consistent with his father's instructions, the son took this money to Fulkerson's residence and gave it to his father.
 
 
 14
 On January 1, 1988 Fulkerson and his wife flew to Illinois to arrange the funeral of Fulkerson's father. Mrs. Fulkerson flew back to Louisiana on January 3 due to the unexpected death of her sister. During this period GMAC began to hear rumblings that Bates Chevrolet was selling cars out of trust to pay off a $500,000 bank loan. A GMAC field representative went to the dealership to inventory the vehicles on Sunday, January 3, 1988 and discovered that over 60 cars were missing from the lot.
 
 
 15
 GMAC conducted a complete wholesale inventory audit of the dealership on January 4, 1988. The audit revealed that 66 vehicles were in fact missing and unpaid. All Bates Chevrolet employees, including Bates, stated unequivocally that they knew nothing about the missing vehicles. GMAC's assistant control branch manager for the area, Henry Habel, then called the Fulkerson residence. Mrs. Fulkerson told Habel that her husband was in Illinois. Mrs. Fulkerson then phoned the dealership and her husband. Upon hearing that GMAC personnel were occupying the dealership, Fulkerson instructed his wife to take the $100,000 check and the $220,500 cash that their son had delivered to the Whitney Bank for payment on the notes. Mrs. Fulkerson did as she was bid.
 
 
 16
 On January 8, 1988 GMAC filed suit against Bates Chevrolet, Fulkerson, Sr., Bates, and the junior Fulkerson,[4] seeking a temporary restraining order and a preliminary and permanent injunction prohibiting the transfer of the cars on which GMAC held a security interest. GMAC also sought contract damages arising from Bates Chevrolet's breach of the Financing Agreement. In addition to claiming damages against Bates Chevrolet for this breach, GMAC also sought to pierce the corporate veil and hold Fulkerson and Bates directly liable. Finally, GMAC sought damages in tort against Fulkerson, Sr., Bates, and Fulkerson, II for inducing breach of contract, conversion, and fraudulent conveyance.
 
 
 17
 The district court issued a temporary restraining order on January 8, 1988. This was converted to a preliminary injunction on January 12, 1988. On February 24 Bates Chevrolet successfully moved to join GM as an involuntary plaintiff. Bates Chevrolet then filed a nine-count counterclaim against GMAC and GM seeking approximately $7,000,000 in actual damages and $20,000,000 in punitive damages, alleging among other things that GM and GMAC had forced Bates Chevrolet to order vehicles.
 
 
 18
 Due to a conflict of interest the district judge recused himself and the parties agreed to refer this case to Magistrate Judge Britt Singletary for trial. At the close of the evidence the magistrate judge granted a directed verdict in favor of the individual defendants on each of the claims. On July 6, 1990 the jury returned a verdict in favor of GMAC on both its breach of contract claim and Bates Chevrolet's counterclaims. GMAC filed a timely notice of appeal from the directed verdicts.
 
 
 19
 On October 11, 1990 the defendants moved for Rule 11 sanctions against GMAC for seeking the temporary restraining order on January 8, 1988 without having notified Fulkerson. The magistrate judge granted this motion on January 7, 1991, awarding $5,000 in sanctions against GMAC. GMAC timely appealed this order. The two appeals were consolidated.
 
 Analysis
 Directed Verdicts
 
 20
 In directing verdicts in favor of the Fulkersons and Bates in their individual capacities, the magistrate judge held that: (1) as to the contract claim, GMAC had failed to offer credible evidence sufficient to present a jury issue on the demand that the corporate veil be pierced and, (2) as to the tort claims, the individual defendants, "as agents and officers of the dealership," were acting within the course and scope of their employment.
 
 
 21
 In reviewing the disposition of a motion for a directed verdict we apply the same tests as the trial court without deference to its decision. Melton v. Deere & Co., 887 F.2d 1241 (5th Cir.1989). The appropriate test as defined by Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir.1969) (en banc ), is to
 
 
 22
 consider all of the evidence ... in the light and with all reasonable inference most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fair minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.
 
 
 23
 In this diversity case, as an Erie court we apply the substantive law of Mississippi. With regards to piercing the corporate veil, the Mississippi Supreme Court has held that
 
 
 24
 [t]o cause a court to disregard the corporate entity and justify shareholder liability, the complaining party must demonstrate: (a) some frustration of contractual expectations regarding the party to whom he looked for performance; (b) the flagrant disregard of corporate formalities by the defendant corporation and its principals; (c) a demonstration of fraud or other equivalent misfeasance on the part of the corporate shareholder.
 
 
 25
 Gray v. Edgewater Landing, Inc., 541 So.2d 1044, 1047 (Miss.1989). "[A] party must present some credible evidence on each of these points" before the issue of whether to pierce the corporate veil may go to the jury. Id.
 
 
 26
 Applying these standards to the case at bar, we find that GMAC offered proof sufficient to create a jury issue. Although the Financing Agreement was signed only by the corporation, its true persona was purposefully concealed from GM when it was asked to grant a franchise and extend inventory financing. The initial franchise application with GM asserted that a former dealer with years of experience was connected with Bates Chevrolet when, in truth, he was not. Also the application disclosed neither Fulkerson's involvement nor the significant Whitney Bank debt. When Fulkerson finally disclosed his interest he failed to disclose the true financial status of the dealership and that he, and not "president" and "dealer-operator" Bates, would actually be running the dealership.
 
 
 27
 As for the second Gray requirement, evidence submitted at trial demonstrated that no regular board meetings were held, nor were any minutes maintained which memorialized corporate decisions. When the operation needed money Fulkerson would float "loans" to the dealership. By December of 1987 nearly all corporate formalities were ignored. Fulkerson ordered the office manager to stop paying GMAC for automobiles covered by the Financing Agreement, he sold groups of cars to wholesalers at $4,000 below invoice, and he fired and hired individuals--all with complete indifference to the corporate organization.
 
 
 28
 Finally, GMAC presented credible evidence suggesting that Fulkerson and Bates acted fraudulently, or at the very least, with misfeasance. While "the corporate fiction will not be disregarded in cases of simple negligence," shareholders "may be held liable for misfeasance." Id. (quoting Kaites v. Department of Environmental Resources, 108 Pa.Cmwlth. 267, 529 A.2d 1148, 1151 (1987)). In December of 1987 over 50 vehicles were sold, nearly 40 at prices significantly below inventory cost, with no intention to pay GMAC as required under the Financing Agreement. As noted, the proceeds from the sale of these vehicles were used to satisfy loans personally guaranteed by Fulkerson and Bates.
 
 
 29
 "This, of course, does not mean that there is sufficient evidence to require a jury verdict in favor of [GMAC] on this issue." FMC Finance Corp. v. Murphree, 632 F.2d 413, 424 (5th Cir.1980). Because GMAC has presented "credible evidence" on each point as required by Mississippi law, however, under Mississippi law the issue of piercing the corporate veil is for the jury to decide. Accord T.C.L., Inc. v. Lacoste, 431 So.2d 918 (Miss.1983).
 
 
 30
 The magistrate judge also erred when he directed a verdict in favor of the individual defendants because they were acting within the course of their employment. "It is well settled law that when corporate officers directly participate in or authorize the commission of a wrongful act, even if the act is done on behalf of the corporation, they may be personally liable." Moss v. Ole South Real Estate, Inc., 933 F.2d 1300, 1312 (5th Cir.1991) (citing Mozingo v. Correct Mfg. Corp., 752 F.2d 168, 173 (5th Cir.1985) (both cases applying Mississippi law)). GMAC submitted sufficient evidence to establish a prima facie showing that the individual defendants committed tortious interference with a contract, conversion and fraudulent conveyance.[5] There was also sufficient evidence to support a jury finding that the individual defendants had "some direct, personal participation in the tort[s]" and not mere tangential involvement. Mozingo, 752 F.2d at 174 (quoting Escude Cruz v. Ortho Pharmaceutical Corp., 619 F.2d 902 (1st Cir.1980)). If the jury were to find that any of the individual defendants were guilty of one of the alleged torts, that individual may be held personally liable. Mozingo; First Mobile Home Corp. v. Little, 298 So.2d 676 (Miss.1974).
 
 Rule 11 Sanction
 
 31
 On October 11, 1990 the defendants moved for Rule 11 sanctions claiming that they were improperly restrained by the TRO which was issued without notice at the request of GMAC. Following a hearing on the motion, the magistrate judge determined that GMAC's January 8, 1988 complaint seeking the TRO was signed in violation of Rule 11 and, therefore, sanctions were required. We review this decision for abuse of discretion. Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990); Thomas v. Capital Security Services, Inc., 836 F.2d 866 (5th Cir.1988) (en banc ).
 
 
 32
 We consider only the inordinate delay between the allegedly sanctionable conduct and the motion for sanctions. GMAC rightly contends that the 33-month delay requires a rejection of the request for sanctions.
 
 
 33
 The advisory committee notes provide that "[a] party seeking sanctions should give notice to the court and the offending party promptly upon discovering a basis for doing so." Fed.R.Civ.P. 11 Notes of Advisory Committee. We have adopted that position en banc, requiring that an attorney "not remain idle after a 'motion, pleading, or other paper' filed in violation of Rule 11 by his opponent has come to his attention." Thomas, 836 F.2d at 879. Accord, Foval v. First Nat. Bank of Commerce, 841 F.2d 126 (5th Cir.1988); Trevino v. Holly Sugar Corp., 811 F.2d 896 (5th Cir.1987) (affirming the district court's denial of Rule 11 sanctions because such motions--filed two years and three months after original suit was filed--were not timely).
 
 
 34
 When the primary purpose for imposing sanctions is to deter, as it was in this case, "it is precept that sanctions ... be imposed within a time frame that has a nexus to the behavior sought to be deterred." Thomas, 836 F.2d at 881. When the individual defendants in this case failed to file their Rule 11 motion for two years and nine months following the alleged abuse, the purposes behind Rule 11 were not served. "[P]rompt action helps enhance the credibility of the rule and, by deterring further abuse, achieve its therapeutic purpose." Id. (quoting In re Yagman, 796 F.2d 1165, 1183 (9th Cir.1986), cert. denied, 484 U.S. 963, 108 S.Ct. 450, 98 L.Ed.2d 390 (1987)). By the time the Rule 11 motion was filed in the present case, the trial was over and the person who had signed the GMAC affidavit on January 8, 1988 had retired from GMAC. Given the lateness of this motion, the magistrate judge abused his discretion in imposing sanctions.
 
 
 35
 We REVERSE the order imposing sanctions on GMAC and we REVERSE the grant of directed verdicts and REMAND for a new trial.
 
 
 
 [1]
 In relevant part, the Financing Agreement provided:
 [Bates Chevrolet] agrees to pay the Invoice Amount ... for each Vehicle shipped on an installment sale basis pursuant to this Agreement in accordance with the following installment schedule:
 (i) 90% due upon Vehicle sale by [Bates Chevrolet]; and
 (ii) 10% due on the fifth day of the second month following the month in which such sale occurs.
 
 
 [2]
 The used cars never reached the used car lot; they were instead taken to Fulkerson's airplane hanger
 With regards to the used cars, testimony reflects that Fulkerson gave inflated trade-in allowances for 10 new vehicles sold out of trust to himself, his family, and employees during December of 1987. For example, an $11,000 trade-in allowance was given on a 1978 Volkswagen for the purchase of a $13,000 1988 Camaro. At that time, the average trade-in value for a nine-year-old Volkswagen was less than $2,000.
 
 
 [3]
 The primary checking account was at the First National Bank of Picayune which, by December 31, 1987, had outstanding checks for approximately $53,000 more than the balance of the account
 
 
 [4]
 GMAC also sued the car wholesalers who had purchased the vehicles at $4,000 below dealer invoice. Those defendants, however, were later dismissed from the case
 
 
 [5]
 Under Mississippi law, "[a] conversion occurs when a person exercises an unauthorized act of dominion or ownership over the personal property of another." Cycles, Ltd. v. W.J. Digby, Inc., 889 F.2d 612, 619 (5th Cir.1989) (citing Masonite Corp. v. Williamson, 404 So.2d 565, 567 (Miss.1981)). Cf. Ford Motor Credit Co. v. Owens, 807 F.2d 1556 (11th Cir.1987) (corporate shareholder liable with his automobile dealership for conversion because he sold automobiles under a financing agreement and decided to keep the proceeds)
 "[A] party to a contract has a right of action [for tortious interference with that contract] against a person or corporation who has willfully procured a breach of the contract by the other party." Mississippi Interstate Express, Inc. v. Transpo, Inc., 681 F.2d 1003, 1012 (5th Cir.1982). While a party to a contract cannot be charged for interfering with his own contract, Knight v. Sharif, 875 F.2d 516 (5th Cir.1989), the individual defendants will enjoy this defense only if they were acting as agents for Bates Chevrolet and their actions were taken in good faith. Shaw v. Burchfield, 481 So.2d 247 (Miss.1985).
 Finally, as to the fraud claim, "directors of an insolvent corporation" may not "prefer themselves, by devoting its assets to pay debts ... on which they are bound as endorser for the corporation." Love Mfg. Co. v. Queen City Mfg. Co., 74 Miss. 290, 20 So. 146 (1896). Such self-dealing may constitute fraud on the creditors. Cooper v. Mississippi Land Co., 220 So.2d 302 (Miss.1969); Smith v. Mississippi Livestock Producers Ass'n, 188 So.2d 758 (Miss.1966).