**Elbie MOZINGO, Plaintiff-Appellant, Cross-Appellee,**

v.

**CORRECT MANUFACTURING CORPORATION and G.W. Way, Defendants-Appellees,**

**Correct Manufacturing Corporation, Defendant-Appellee, Cross-Appellant.**

**No. 84–4059.**

United States Court of Appeals, Fifth Circuit.

Feb. 7, 1985.

---

Smith, Smith, Tate, Stuart & Cruthird, David R. Smith, Richard C. Fitzpatrick, Poplarville, Miss., for plaintiff-appellant, cross-appellee.

Easterling & Varnado, Carey R. Varnado, Hattiesburg, Miss., for defendants-appellees.

Before GOLDBERG, JOHNSON and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

On July 19, 1977, Elbie Mozingo was testing the operation of a Skyworker brand "cherrypicker" (a device similar to a crane with a bucket on the end of the boom), after completing repairs on it at a shop in Laurel, Mississippi. When Mozingo, who was in the bucket, moved the bucket on the Skyworker rapidly about, the boom on the unit suddenly collapsed, precipitating the bucket and Mozingo to the ground and seriously injuring Mozingo. Two opposed systems of cables operated by a hydraulic unit raise and lower the boom. The apparent cause of the collapse was that a cable in this system slipped off a yoke forming part of the system, allowing the boom to fall.

Mozingo filed this products liability action against Correct Manufacturing, Inc., a Delaware corporation which owned the Skyworker manufacturing enterprise, and G.W. Way, the president of Correct.[1] Mozingo contended that the Skyworker was defective because as it was designed and constructed it did not have a clip or retaining clamp to prevent the cable slipping from the yoke.

The district court granted a directed verdict in favor of Way on the issue of Way's personal liability. The court refused a directed verdict on the issue of Correct's liability as a "successor" corporation to Transairco. The case was submitted to the jury on three alternative theories: (1) negligence, (2) strict liability in tort, and (3) breach of an independent duty to warn. The jury returned a verdict for Mozingo. Correct promptly filed a motion for judgment NOV or a new trial, which the district court took under advisement. Several weeks later, the district court granted JNOV on the basis of the collateral estoppel effect of this circuit's decision in *Gaither v. Hughes-Keenan Corp.*, 721 F.2d 817 (5th Cir.1983) (unpublished), although Correct had not urged collateral estoppel at any point during the trial.

In this appeal, Mozingo contends that the district court erred in granting JNOV on

---

1. The facts concerning the corporate history of Correct, the Skyworker Corporation facilities and product line and the relationship of G.W. Way to each is set out in more detail in part II, infra.

the basis of collateral estoppel, and in granting a directed verdict on the issue of Way's personal liability. Correct defends the grant of JNOV, and alternatively cross appeals contending that there is insufficient evidence to support submission to the jury of any of the theories of Correct's liability. In addition, Correct contends that the district court erroneously instructed the jury using the "product line" theory of successor corporation liability, which has been expressly rejected by this court.

We reverse the grant of JNOV and reinstate the jury verdict against Correct, but affirm the directed verdict in favor of G.W. Way.

## I. APPLICATION OF COLLATERAL ESTOPPEL FOLLOWING JURY VERDICT

■ Collateral estoppel, or issue preclusion, is generally considered to be a variant of the doctrine of res judicata.[2] Under F.R.C.P. 8(c),[3] res judicata, and hence collateral estoppel, is an affirmative defense which if not pled is considered waived. The district court is granted a measure of discretion to allow late amendment to press a defense when no prejudice would result to the other party, and the ends of justice so require. *E.g. Allied Chemical Corp. v. Mackay*, 695 F.2d 854, 855–56 (5th Cir. 1983). In this case, equity and the purposes underlying the doctrine of collateral estoppel militate strongly against allowing this defense to be asserted after trial.

■ Collateral estoppel has two purposes, to protect litigants "from the burden of relitigating an identical issue with the same party or his privy, and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326, 99 S.Ct. 645, 58 L.Ed.2d 552, 559 (1979). Neither of these purposes

is served by the application of collateral estoppel after a factual issue has been fully developed through a well-contested trial and submitted to the jury for decision.

In addition, the terms of F.R.C.P. 50(b) allow a party to move "to have the verdict and any judgment entered thereon set aside and to have judgment entered *in accordance with his motion for a directed verdict ...*" We have held on several occasions that since the motion for JNOV is "technically only a renewal of the motion for a directed verdict ... it cannot assert a ground that was not included in the motion for a directed verdict." *E.g., Sulmeyer v. Coca Cola Co.*, 515 F.2d 835, 846 (5th Cir. 1975), *cert. denied*, 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976); *accord Johnson v. Rogers*, 621 F.2d 300, 305 (8th Cir. 1980). Correct has not cited us to authority or produced any argument indicating that a different result should obtain in this case.

Since we conclude that the district court abused its discretion in granting JNOV on the basis of collateral estoppel, we now address the other issues raised by the parties.

## II. SUCCESSOR CORPORATION AND CORPORATE OFFICER LIABILITY

Mozingo's appeal of the directed verdict on the issue of Way's personal liability and Correct's cross appeal on the issue of successor corporation liability are intimately related factually. We preface our discussion with a brief summary of the relevant facts concerning the history of Correct Manufacturing, the Skyworker enterprise and G.W. Way's connection with these entities.

In 1957, the Hughes-Keenan Corporation, a manufacturing concern organized by G.W. Way in the late 1940's, became a

---

**2.** For a complete explanation of the complexities of both of these doctrines, see IB *Moore's Federal Practice* ¶¶ 0.405[3]–0.448. This case presents a number of latent and potentially thorny issues concerning the use of collateral estoppel, particularly since Mòzingo had nothing at all to do with the *Gaither* case. The

narrow ground on which we decide this issue makes it unnecessary for us to address these issues.

**3.** "(c) Affirmative Defenses. In pleading to a preceding pleading, a party shall set forth affirmatively ... res judicata, ...."

division of the United States Air Conditioning Corporation. In 1960, United States Air Conditioning acquired the Skyworker enterprise, which became a part of the Hughes-Keenan division. In 1966, United States Air Conditioning changed its corporate name to Transairco. In 1971, Transairco merged with a group of companies owned by a Mr. Andreoli. From 1957 until 1971, Way was president and general manager of Transairco and its predecessor, and until the 1971 merger, held a controlling interest in Transairco. After his resignation as president and general manager in 1971, Way continued as a director of Transairco.

In mid-August of 1972, Transairco agreed with Way and certain Transairco stockholders to incorporate a wholly-owned subsidiary, Correct Manufacturing Corporation. At Correct's first board meeting, on August 31, 1972, Correct accepted an offer from Transairco to acquire a majority of Transairco's manufacturing assets, including those of the Skyworker enterprise. Way and his family then swapped all of their shares in Transairco for all of the shares of Correct Manufacturing, at which point Correct ceased to be associated with Transairco. Andreoli was elected the first president of Correct on August 31, 1972, but Way became Correct's president and general manager on September 1, 1972.

After the splitoff from Transairco, Correct continued to manufacture Skyworker products, maintain Skyworker service contracts, sell parts for Skyworkers, and do business with the same dealers. Correct continued to use a number of components bearing the Hughes-Keenan name for some time after the splitoff. In its promotional literature, the Skyworker enterprise emphasized its long history of production. The same management and employees continued with the Skyworker Corporation, and its production facilities remained in the same physical location.

The design for the particular model of Skyworker in which Mozingo was injured was first suggested by a Georgia Skyworker dealer. This model, the 6950A, utilized a fifty-foot boom mounted on an "A knuckle." The booms used in other models were four or five feet shorter, and Way had some reservations concerning the unit's safety, since the longer boom would put more stress on the cable system. Way authorized the production of a single prototype unit in 1969. Approximately twenty-three of these units were manufactured prior to Way's resignation in 1972, although on whose order is unclear. Apparently Way did not realize until after the Correct-Transairco split that these units had been manufactured.

## A. PERSONAL LIABILITY OF WAY

In this diversity case, we are *Erie*-bound to follow the substantive law of Mississippi. Although the Mississippi courts have not spoken in depth on the subject, Mississippi follows the general rule that when a corporate officer directly participates in or authorizes the commission of a tort, even on the behalf of the corporation, he may be held personally liable.[4] Based on this principle, Mozingo contends that Way's failure to pursue his questions concerning the safety of the Skyworker constituted sufficient evidence of Way's personal participation in a tort to send the question of his liability to the jury. We disagree.

Way testified that his concern was that the use of a fifty-foot boom could cause the wire cables used in the hydraulic system to become overstressed, and that a fastener attached to the ends of the cables could possibly fail. Mozingo's counsel also elicited from Way the admission that overstressing could also cause some unspecified stretching of the cables. Way did not direct the manufacture of the 6950A units which were produced, and indeed appears to have had little or nothing at all to do

---

4. *The First Mobile Home Corporation v. Little,* 298 So.2d 676, 679 (Miss.1974); *Grapico Bottling Co. v. Ennis,* 140 Miss. 502, 106 So. 97, 98 (1925); *Childers v. Beaver Dam Plantation,* 360 F.Supp. 331 (N.D.Miss.1973).

with their production. This sketchy evidence is simply inadequate to support a jury finding that Way personally participated in the tort. Mozingo has cited us to no products liability case in which a corporate officer having this kind of peripheral involvement with the development and manufacture of a product has been held personally liable. The thrust of the general rule is that the officer to be held personally liable must have some direct, personal participation in the tort, "as where the defendant was the 'guiding spirit' behind the wrongful conduct ... or the 'central figure' in the challenged corporate activity." *Escrude Cruz v. Ortho Pharmaceutical Corp.*, 619 F.2d 902, 907 (1st Cir.1980) (cites omitted). If Way can be held personally liable in this case, any corporate officer who fails to maintain an almost total ignorance of the products the corporation produces may be personally liable in the event a defective product is produced. We are not persuaded that the Mississippi courts would adopt such a position and conclude that the district court did not err in directing a verdict for Way.

## B. SUCCESSOR CORPORATION LIABILITY

■ The traditional rule has been that a corporation which acquires manufacturing assets (generally known as the "successor

corporation") from another corporation does not take the liabilities of the predecessor corporation from which the assets are acquired. *See generally* Fletcher, *Cyclopedia of the Law of Private Corporations,* § 7122. There are, however, four generally recognized exceptions to this rule: (1) when the successor expressly or impliedly agrees to assume the liabilities of the predecessor; (2) when the transaction may be considered a de facto merger; (3) when the successor may be considered a "mere continuation" of the predecessor; or (4) when the transaction was fraudulent. *Id.* (collecting cases). Again, there is very little Mississippi law which explicitly addresses the subject, but what there is indicates that Mississippi would follow the general rule.[5]

■ Only one of the exceptions—the "mere continuation" exception—is seriously at issue in this case.[6] The question whether a corporation is a continuation of a predecessor has been one of some ferment in the past decade and, predictably, has engendered a good deal of scholarly commentary.[7] Three distinct lines of cases have evolved.

The traditional rule with regard to the continuation exception, on which Correct relies, is that a corporation is not to be considered a continuation of a predecessor unless, after the transfer of assets, only

---

**5.** *E.g., West Center Apartments Ltd. v. Keyes,* 371 So.2d 854, 857 (Miss.1979); *Hood Industries, Inc. v. King,* 255 So.2d 912, 916 (Miss.1971); *Mississippi Cotton Seed Products Co. v. Planters Manufacturing,* 159 Miss. 153, 132 So. 96 (1931).

**6.** Mozingo makes some argument that there was an express assumption of liabilities by Correct. At the time of the corporate split in 1972, Correct agreed to "save and hold harmless Transairco from any and all claims, expense, or liabilities arising out of the said prior manufacture or in any way connected therewith ..." In 1975, Transairco and Correct entered into another agreement, which provided in part:

As a further inducement to Correct as for the consideration, [Transairco acknowledges] that it has and does accept full and total responsibility with respect to all products manufactured by [Transairco and] agrees to fully indemnify and hold harmless Correct for any and all claims, suits and liabilities rising from

any and all products manufactured by [Transairco] ...

Mozingo argues alternatively that the 1975 agreement was merely an indemnification agreement between Transairco and Correct, or that the 1975 agreement was a sham which the jury obviously saw through. We find no evidence in the record that the 1975 agreement was a sham, nor does Mozingo produce more than a conclusory statement to support the argument that the 1975 agreement is merely an indemnification agreement.

**7.** *See Products Liability of Successor Corporations: A Policy Analysis,* 58 *Ind.L.J.* 677 (1983); Note, *Post-Dissolution Product Claims and the Emerging Rule of Successor Liability,* 64 *Va.L. Rev.* 861 (1978); Note, *Successor Corporations' Products Liability,* 28 *Hastings L.J.* 1305 (1976); Note, *Cyr v. B. Offen & Co.: Liability of Business Transferees for Product Injuries,* 27 *Me.L.Rev.* 305 (1975).

one corporation remains, and there is an identity of stock, stockholders, and directors between the two corporations. *E.g.* *Weaver v. Nash International*, 730 F.2d 547, 548 (8th Cir.1984); *Travis v. Harris Corp.*, 565 F.2d 443, 447 (7th Cir.1977). In the past decade a number of cases have deviated from this rule. These cases may be roughly divided into two groups.

The first group is identified with the California Supreme Court decision in *Ray v. Alad Corp.*, 19 Cal.3d 22, 560 P.2d 3, 136 Cal.Rptr. 574 (1977), which adopts what is popularly known as the "product line" theory. In *Ray*, the California Supreme Court held that a successor which continued to manufacture the same product line as the predecessor, under the same name, with no outward indication of any change of ownership of the business could be held liable on products liability claims resulting from products manufactured by the predecessor. The *Ray* or product line theory of recovery is best characterized as a completely new exception to the rule of non-liability. The product line theory is based largely on the idea that the successor corporation is, like the predecessor, in a position to assume the risk-spreading role assigned to the manufacturer of a product by strict liability theory. A second premise for the product line theory is akin to an estoppel—principles of fairness require that a corporation which exploits the goodwill attached to a predecessor's product also bear the burdens attached to the product. 560 P.2d at 9, 136 Cal.Rptr. at 581. The product line theory has since been adopted by at least two other state courts,[8] although the federal courts, including this circuit, have been reluctant to apply this theory in Erie situations in the absence of clear authority from the highest court of a state.[9]

A second group of cases follows what is sometimes called the "continuity of enterprise" theory. The cases generally regarded as seminal in this group are *Cyr v. B. Offen & Co.*, 501 F.2d 1145 (1st Cir.1974) and *Turner v. Bituminous Casualty Co.*, 397 Mich. 406, 244 N.W.2d 873 (1976). The continuity of enterprise theory is in the nature of an expansion of the mere continuance exception to the rule of non-liability. This theory, rather than making existence of a single corporation and identity of stock, stockholders and officers determinative, considers other factors as well. Factors other than the traditional ones which are typically taken into account in determining whether there is a continuity of enterprise are: (1) retention of the same employees; (2) retention of the same supervisory personnel; (3) retention of the same production facilities in the same physical location; (4) production of the same product; (5) retention of the same name; (6) continuity of assets; (7) continuity of general business operations; and (8) whether the successor holds itself out as the continuation of the previous enterprise.[10]

It may be readily seen that, although the two theories overlap to some extent in that both take account of continuity of product line, the continuity of enterprise theory is a less radical departure from traditional corporate theory than is the product line theory. The district court in this case instructed the jury on the basis of the continuity of enterprise theory exemplified by *Cyr*, not on the basis of the pure product line theory. For that reason, this case is not directly controlled by this circuit's decision in *Rhynes v. Branick Manufacturing Co.* In the peculiar circumstances of this case, we conclude that the district court did not err in submitting plaintiff's

**8.** *Ramirez v. Amsted Industries*, 86 N.J. 332, 431 A.2d 811 (1981); *Dawejko v. Jorgensen Steel Co.*, 290 Pa.Super. 15, 434 A.2d 106 (1981).

**9.** *See, e.g.*, *Rhynes v. Branick Manufacturing Corp.*, 629 F.2d 409, 410 (5th Cir.1980); *Tucker v. Paxson Machine Co.*, 645 F.2d 620, 624–25 (8th Cir.1981); *Leannais v. Cincinnati, Inc.*, 565 F.2d 437, 441 (7th Cir.1977).

**10.** *Cyr*, 501 F.2d at 1153–54; *Bonee v. L & M Construction Chemicals*, 518 F.Supp. 375, 381 (M.D.Tenn.1981); *Trimper v. Bruno-Sherman Corp.*, 436 F.Supp. 349, 350–51 (E.D.Mich.1977); *Holloway v. John E. Smith's Sons*, 432 F.Supp. 454, 455–56 (D.S.C.1977); *Turner*, 397 Mich. at 420, 244 N.W.2d at 879; *Rivers v. Stihl, Inc.*, 434 So.2d 766, 771–72 (Ala.1983).

claim against Correct to the jury on the continuity of enterprise theory.

This is not a case in which a completely independent corporation purchased manufacturing facilities from another corporation. Here, a corporation formed a subsidiary for the specific purpose of acquiring certain manufacturing assets, with the ultimate goal of placing those assets in the hands of a specific group of its stockholders. Most of the elements required by the traditional rule were in fact present in this case. The new corporation was represented in the management of the predecessor corporation and was intimately involved with the past management of the manufacturing enterprises acquired. There was a substantial degree of identity of stockholders, and identity of stock in the sense that the Transairco stock was simply converted to Correct stock.

Since it was represented in the stockholders and management of Transairco, Correct as a corporate entity was aware of the potential for products liability claims resulting from Skyworkers, and thus was in the same position as Transairco to assume the risk-spreading function which is the underpinning of strict liability. In addition, this representation in Transairco prevents liability from being imposed without responsibility. Although Mississippi law is in keeping with the general rule in this area, we find no indication, ancient or recent, that Mississippi courts would strictly adhere to the general rule. Finally, when there is no clear state authority, the opinion of a district judge sitting in his own state is entitled to great weight on appeal. *Acree v. Shell Oil Co.*, 721 F.2d 524, 525 (5th Cir.1983); *Watson v. Callon Petroleum Co.*, 632 F.2d 646, 648 (5th Cir.1980). We therefore conclude that the district judge's instructions were not erroneous, and that the evidence was sufficient to send the successor corporation issue to the jury.

11. *See Early-Gary, Inc. v. Walters*, 294 So.2d 181, 185–86 (Miss.1974); *Ford Motor Co. v. Matthews*, 291 So.2d 169, 174 (Miss.1974); *State*

### III. SUFFICIENCY OF THE EVIDENCE

█ In its cross appeal, Correct asserts that the district court erred in denying its motion for a directed verdict on a number of different grounds, in essence: (1) whether the elements of strict liability in tort were present; (2) whether Correct breached an independent duty to warn; and (3) whether the accident was caused by a failure to properly maintain the Skyworker. Since the case was presented to the jury on multiple theories of liability but a general verdict form was used, the burden is on Mozingo to support the submission of each theory of liability to the jury. *Royal Typewriter Co. v. Xerographic Supplies*, 719 F.2d 1092, 1099, 1099 n. 1 (11th Cir.1983). If any of these theories lacks the necessary support, a new trial is required. *Id.*

#### A. *Strict Liability in Tort*

█ Mississippi follows the theory of strict liability outlined in section 402A of the Restatement of Torts. In essence, three elements are required for a successful strict liability action: (1) the defendant placed on the market a product in a defective condition unreasonably dangerous for its intended use; (2) the plaintiff was using the product in a manner which was reasonably foreseeable; and (3) the defective condition proximately caused the injury to the plaintiff.[11] Correct disputes the presence of each of these elements in this case. The standard of review used to determine whether a grant or denial of a directed verdict was proper is whether, considering all of the evidence in the light and with all reasonable inferences most favorable to the party opposed to the motion, there is evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions. If this evidence is present, then the case should go to the jury. *E.g., Gross v. Black & Decker, Inc.*, 695 F.2d 858, 864 (5th Cir.1983).

*Stove Manufacturing Co. v. Hodges*, 189 So.2d 113, 120–21 (Miss.1966).

Correct first contends that there was insufficient evidence that they placed the Skyworker unit on the market. They base this contention on the fact that, although the unit was not actually delivered into the hands of the dealer until after Correct took over the Skyworker facilities, the unit was invoiced to the dealer on August 31, 1972, the last day that Transairco controlled the facilities. There was sufficient evidence to allow the jury to conclude that Correct placed the Skyworker in the stream of commerce, since it did not leave the control of the Skyworker division until after Correct took over. Correct relies primarily on testimony to the effect that after a unit was invoiced, the Skyworker division served as nothing more than a warehouse for the product, and the product was entirely the responsibility of the dealer. While this evidence might indicate that Transairco placed the unit on the market, it is not absolutely dispositive of the question.

On the defective or unreasonably dangerous nature of the product, Correct asserts in its brief that each point made by Mozingo's expert with regard to the Skyworker's deficient design was refuted by their expert. We are persuaded that conflicting evidence was presented that required jury resolution.

Correct also contends that Mozingo was not using the Skyworker in a foreseeable manner, in that he was moving the Skyworker rapidly about, causing it to bounce up and down. There was conflicting testimony on this point, and again in such a case it is the province of the jury to sort out the truth. In addition, under Mississippi law foreseeable *misuse* of a product causing injury may also give rise to strict liability. *Ford Motor Co. v. Matthews*, 291 So.2d at 174–75.

### B. Negligent Failure to Warn

A successor corporation may have a duty to warn of discovered defects in its predecessor's products, but this duty does not arise unless there is some continuation of the relationship between the successor and the customers of the predecessor. Some of the factors which are used in determining whether there is a continuity of a relationship is (1) whether the successor takes over the service contracts of the predecessor; (2) whether the successor knows of defects in the equipment; and (3) whether the successor knows of the location of the owners of the equipment.[12] Since the negligent failure to warn issue was not included in the motion for directed verdict, we review this issue only to determine if there was *any* evidence to support the jury verdict. *Bunch v. Walter*, 673 F.2d 127, 130 n. 4 (5th Cir.1982). There was evidence in the record that Correct was aware that the cables on this unit could stretch, become slack, and if they became slack, could conceivably come off the yoke, causing the boom to fall. The jury was also entitled to infer that Correct also knew that the chance such a mishap would occur was increased by having a heavy operator move the bucket rapidly, and that the warnings against such operations were inadequate. Further, there was evidence that Correct took over service obligations with regard to the Skyworker units. While not overwhelming, this evidence was sufficient for the jury to conclude that Correct had a duty to warn of a defect in the Skyworker.

### C. Failure to Properly Maintain the Skyworker

Finally, Correct contends that the failure of the owner of the Skyworker to properly maintain it was the cause of the accident. They point to testimony that the individuals responsible for the Skyworker were not given materials or directions to permit the proper maintenance program to be followed with the unit and that no routine, periodic maintenance was performed on the unit. Mozingo produced expert testimony, however, to the effect that, had the Skyworker unit been properly designed, even the lack of maintenance Correct posits would not have caused the boom to fall.

12. *See Tucker v. Paxson Machine Co.*, 645 F.2d 620, 626 (8th Cir.1981); *Gee v. Tenneco, Inc.*, 615 F.2d 857, 865–66 (9th Cir.1980); *Leannais v. Cincinnati, Inc.*, 565 F.2d at 441–42.

Thus, the evidence was entirely sufficient to send this question to the jury.[13]

## CONCLUSION

Judgment notwithstanding the verdict should not have been granted in this case on the basis of collateral estoppel after the jury returned a verdict. The district court's instruction on Correct's liability as a successor corporation was not clearly wrong and is AFFIRMED, as is the directed verdict in favor of G.W. Way. Sufficient evidence was presented to warrant sending each theory of liability to the jury. Accordingly, the judgment of the district court is reversed and the action remanded for entry of judgment on the jury verdict.

REVERSED and REMANDED.

---

**13.** This issue was not explicitly raised in Correct's motion for directed verdict, although it might be taken as implicit. Regardless of which standard of review we use, there was sufficient evidence to support sending the issue to the jury.