930 F.Supp. 474 (1996)
STATE OF WASHINGTON; and Paccar, Inc., Plaintiffs,
v.
UNITED STATES of America; United States Navy; United States Army; and United States Coastguard, Defendants.
UNITED STATES of America, Plaintiff,
v.
STATE OF WASHINGTON and Paccar, Inc., Defendants.
No. C94-5326FDB, C94-5518FDB.
United States District Court, W.D. Washington, Tacoma.
June 21, 1996.
*475 Charles F. Secrest, Deborah Lee Cade, Attorney General's Office, Olympia, WA, for State of Washington.
William D. Maer, Kathryn Guillou, Ralph Palumbo, Heller, Ehrman, White & McAuliffe, Seattle, WA, for PACCAR, Inc.
Ricardo A. Guarnero, U.S. Attorney's Office, Seattle, WA, Richard David Mednick, Regional Cnsl., U.S. Environmental Protection Agency, Seattle, WA, James L. Nicoll, Jr., U.S. Department of Justice, Environmental Enforcement Section, Seattle, WA, Sean Kevin Carman, U.S. Department of Justice, Environmental Enforcement Section, Washington, DC, Lewis M. Barr, U.S. Department of Justice, Environmental Defense Section, Washington, DC, for U.S.
Ricardo A. Guarnerc, U.S. Attys. Office, Seattle, WA, Lewis M. Barr, U.S. Dept. of Justice, Environmental Defense Section, Washington, DC, for United States Navy, United States Department of Army, United States Coast Guard.

ORDER SUSTAINING OBJECTIONS TO R & R of FEBRUARY 26, 1996
BURGESS, District Judge.
This matter comes before the court upon the United States' objections to the Magistrate Judge's Report and Recommendation concerning the United States' motions for summary judgment on the issues of (1) PACCAR's liability as a successor to each of the three companies that operated Eagle Harbor shipyard before PACCAR, and (2) the United States' liability as an "operator" or "owner" of the Eagle Harbor shipyard within the meaning of CERCLA. The objections are sustained.

REPORT AND RECOMMENDATION
The Magistrate Judge recommended denial of the United States' motion for partial summary judgment on successor liability concluding that the continuing business exception should not be adopted in this case because PACCAR was not provided any notice of the potential for CERCLA liability. The Magistrate Judge relied on cases cited by PACCAR that were interpreted to require the element of notice when applying the continuing business exception. The R & R concluded that since PACCAR purchased the business and most of the assets of Commercial Ship Repair (CSR) on June 1, 1953, neither PACCAR nor its predecessor owners *476 of the ship building and repair facility (the Shipyard) could have had notice of any potential CERCLA liability for the reason that CERCLA was not enacted until 1980.
The Magistrate Judge declined to grant summary judgment for the United States on the issue of whether the United States operated the shipyard within the meaning of CERCLA "because a material issue of fact exists regarding the extent of the United States' presence and authority at the Shipyard during World War II." (R & R at 10.) While indicating in the preamble to the Report and Recommendation that the Magistrate Judge reviewed the motion, responses, and the remaining record, in reaching his conclusion, he referenced only two documents. In referring to the first document, he stated: "Significantly," the State and PACCAR have produced an excerpt from a document entitled "Wartime History of the Supervisors of Shipbuilding, United States Navy, Seattle, Washington." (Id.) The Magistrate Judge quoted from that document the following three paragraphs:
Resident Assistant Supervisors at outlying yards operated under the direct supervision of the Supervisor of Shipbuilding. Their major duties were the inspection of ship construction, promoting the efficiency of the yards, and expediting the shipbuilding program. Every effort was made by the main office to relieve Resident Assistant Inspectors of unnecessary paper work. Frequent inspections were made by the security officer, the labor relations officer, and other specialists attached to the main office in order to avoid any interference with the war effort and to comply with directives issued by the Navy Department, the War Labor Board, War Production Board, and other Government agencies.
The historical development of the activity requires some slight mention of the effect of different attitudes toward the accomplishment of the program. First, it will be recalled that the office was definitely understaffed and struggled with the increasing workload under rather overwhelming odds. With the advent of the new Supervisor of Shipbuilding and specific instructions as implemented by the Bureau's letter of 21 October 1943, various changes were initiated. This procedure did not take place all at once, but was the result of studied and well considered development of administrative demands.
A very definite stand in policy was taken by the Supervisor of backing up the Resident Offices in all dealing with the shipyards contractors. As a result of this policy, the Resident Offices were delegated definite authority in the administration of the contractors' business. This had not heretofore been done, and probably not contemplated, but was motivated by the desire to promulgate the Navy Department's policy as to cost-consciousness, as set forth in Bureau of Ships letter FS/S31 (100) over EN26/A2-11 dated 21 October 1943. Inasmuch as the great bulk of the contracts were cost-plus-fixed-fee, the Resident Offices were definitely instructed to work with the Cost Inspection Service and actually to control costs,  both direct and indirect.
(Id. at 10, 11.) Referring to the second document, the Magistrate Judge stated:
In addition, the United States has quoted a historical document in its statement of facts as stating, "One of the major problems in this field [inspecting shipyard costs and services] was the difficulty of supervising efficient and economic contract industrial operations of cost-plus-fixed-fee Naval contractors without exercising actual industrial control."
(Id. at 11, citing ¶ 197 of the United States' Defense Statement of Material Facts Not Subject To Genuine Dispute.)

OBJECTIONS
The United States objects to the Report and Recommendation denying successor liability for PACCAR and finding a genuine issue of material fact on the issue of the United States' liability as an "operator" of the Shipyard. The Report and Recommendation is rejected and the United States' objections on these issues are sustained. The issues of PACCAR's successor liability and the United States' liability as an operator will be addressed separately.

*477 ANALYSIS

I. Successor Liability
The successor liability issues with respect to PACCAR are (1) whether PACCAR is the successor of CSR, the immediate predecessor company from whom it bought the shipyard business and facilities; and (2) whether PACCAR is the successor of Hall Brothers and Winslow Marine, the other companies who operated the Eagle Harbor shipyard before CSR.
The following facts are recited by the Magistrate Judge and not contested. Hall Brothers finished building and began operating the Shipyard's marine railway in 1903. On June 8, 1916, Hall Brothers sold the Shipyard to Winslow Marine. Sometime in 1946 Commercial Ship Repair (CSR) took over the operations. On June 1, 1953, PACCAR purchased the business and most of the assets of CSR. PACCAR basically performed the same business as the previous owners of the shipyard. The Shipyard closed in 1959.
The issue is whether the continuing business exception also known as the "continuity of enterprise" or "substantial continuation" theory, should be applied in this case, and, more specifically, whether there is a notice requirement for this exception to apply.

A. Covered Persons Under CERCLA
Federal law governs the determination of this issue. Louisiana-Pacific Corp. v. Asarco, Inc., 909 F.2d 1260, 1263 (9th Cir.1990). The District Court must be concerned for national uniformity as it is guided by the general state law of corporate successor liability rather than the excessively narrow statutes that might apply in a few states. Id. The general law of corporate successor liability should also be read in conjunction with the purposes of CERCLA. See United States v. Mexico Feed and Seed Co., 980 F.2d 478, 486-87 (8th Cir.1992). The Mexico Feed court found corporations to be included among CERCLA's "covered persons," and that 1 U.S.C. § 5, providing general rules of construction for Acts of Congress, informs that corporate successors and assigns are included when "company" or "association" are used in reference to corporations. Id. at 486. Mexico Feed also examined CERCLA, a remedial statute with two essential purposes: 1) to provide swift and effective response to hazardous waste sites; and 2) to place the cost of that response on those responsible for creating or maintaining the hazardous condition. Id. The Court concluded:
It would serve little purpose to include corporations responsible for hazardous waste sites, but not their corporate successors, within the class of "covered persons." Even in cases of good faith, a bona-fide successor reaps the economic benefits of its predecessor's use of hazardous disposal methods, and, as the recipient of the benefits, is also responsible for the costs of those benefits.
Id. at 487. The Court thus stated its agreement with the Third, Sixth, and Ninth Circuits that corporate successors are included within the meaning of "persons" for purposes of CERCLA liability.

B. Successor Liability  Traditional Rule & Refinements
The traditional rule of successor liability has been that a corporation that buys the assets of another corporation does not take the liabilities of that corporation. E.g., Mozingo v. Correct Mfg. Corp., 752 F.2d 168, 174 (1985) (citing, generally, Fletcher, Cyclopedia of the Law of Private Corporations, § 7122). Corporate successor liability was created to prevent corporations from evading their liabilities through changes of ownership when there is a buy out or a merger. Mexico Feed, 980 F.2d at 487. Thus, four generally recognized exceptions to the general rule developed:
(1) The purchasing corporation expressly or impliedly agrees to assume the liabilities of the seller,
(2) the transaction amounts to a "de facto" consolidation or merger,
(3) The purchasing corporation is merely a continuation of the selling corporation, or
(4) The transaction was fraudulently entered into in order to escape liability. E.g., Mexico Feed at 487.
*478 Under the "mere continuation" exception, a corporation is not to be considered a continuation of the predecessor unless, after the transfer of assets, only one corporation remains, and there is an identity of stock, stockholders, and directors between the two corporations. Mozingo, 752 F.2d at 174-75. Mozingo traces the deviations from this rule and roughly divides the cases into two groups.
First, is the "product line" theory, which is based on the ideas that (1) the successor corporation, like the predecessor, is in a position to assume the risk-spreading role assigned to the manufacturer of a product by strict liability theory, and that (2) a corporation which exploits the goodwill attached to a predecessor's product also bears the burdens attached to the product. 752 F.2d at 175.
Second, is what is sometimes called the "continuity of enterprise" theory (sometimes referred to as the "substantial continuity" theory, Mexico Feed, 980 F.2d at 487), which, rather than making existence of a single corporation and identity of stock, stockholders and officers determinative, considers other factors as well. Id. Some factors that are examined are as follows: (1) retention of the same employees, (2) retention of the same supervisory personnel, (3) retention of the same production facilities in the same physical location, (4) production of the same product, (5) retention of the same name, (6) continuity of assets, (7) continuity of general business operations, and (8) whether the successor holds itself out as the continuation of the previous enterprise.

a. Successor in labor law context
An early case extending the traditional doctrines to further the public policy behind the labor act found knowledge of an unfair labor practice that remained unremedied significant. The Court explained that the knowledge factor of "substantial continuation" corporations ensured that they would be able to protect themselves through purchase price adjustments or satisfactory indemnity provisions, but would be in some way responsible for the unfair labor practice remedied. Golden State Bottling Co. v. NLRB, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973).

b. Successor in product liability context
Another Court found "substantial continuation" test for liability appropriate in a product liability context. Mozingo v. Correct Mfg. Corp., 752 F.2d 168 (5th Cir.1985) involved a "cherrypicker" that collapsed injuring the plaintiff. G.W. Way was an entrepreneur who started a company in the late 1940s that then became a division of another corporation, which then acquired the company that manufactured the Skyworker product that injured Mozingo. The company changed its name to Transairco and merged with some other companies. Mr. Way held a controlling interest in Transairco and was president and general manager of Transairco and its predecessor until the merger, from 1957 to 1971. After 1971, Mr. Way continued as a director of Transairco. In 1972, Correct Manufacturing Corporation was formed and acquired a majority of Transairco's manufacturing assets, including those of the Skyworker enterprise and ceased to be a part of Transairco. Mr. Way became president and general manager. Correct continued to manufacture Skyworker products, maintain service contracts, sell parts, and do business with the same dealers. Skyworker's long history of production was emphasized. The same management and employees continued, and its production facilities remained in the same physical location.
The particular product on which Mozingo was injured utilized a longer boom that Way had reservations about, because the extra length put strain on the cable system, so he authorized only that a prototype be built. Way did not realize until after the Correct-Transairco split that some 23 units had been manufactured, on whose order it is unclear.
The District Court rendered a directed verdict in favor of Way and sent the claim against Correct to the jury on the continuity of enterprise theory, which action the Fifth Circuit affirmed. The District Court's grant of JNOV to Correct on a collateral estoppel theory not previously argued was reversed *479 and remanded, however. As the Court in Mexico Feed observed regarding Mozingo,
The strong nexus between the seller's defective product and the purchasing corporation justified imposing the wider net of "substantial continuation" liability on the asset purchaser, and, but for the "substantial continuation" test, responsible parties would have evaded liability.
980 F.2d at 488.

c. Successor liability in CERCLA context
Mexico Feed reasoned concerning the "substantial continuation" theory of successor liability:
As we again point out, CERCLA is aimed at imposing clean up costs on the parties responsible for the creation or maintenance of hazardous waste sites. Therefore, in the CERCLA context, the imposition of successor liability under the "substantial continuation" test is justified by a showing that in substance, if not in form, the successor is a responsible party.
980 F.2d at 488. Notwithstanding that the Mexico Feed court acknowledged the broad remedial purpose of CERCLA when considering the appropriateness of analyzing successor liability under the "substantial continuation test," when the Court analyzed the circumstances underlying the issues before it on appeal, however, it concluded that the successor corporation was not liable as a "substantial continuation successor."
The factual background in Mexico Feed is as follows. Pierce Waste Oil Service (PWOS), a waste oil hauling and processing company, was allowed to store (at a rate of $150 a year) four waste oil tanks on a 40' × 40' parcel of Mexico Feed's 53-acre tract from the mid-sixties until 1976 when it stopped using them and allowed them to fall into disrepair. At least once PWOS pumped out a tank when Mexico Feed's president complained it was leaking.
In 1983, Moreco, a pre-existing corporation in the re-refining business with operations in several states, purchased the assets of PWOS. Moreco was primarily interested in PWOS's trucks, routes, drivers, and collecting expertise. There was no allegation that the sale was not at arms length, that the terms of sale were unfair. The PWOS president resigned a few months before the sale and never worked for Moreco. Moreco had PWOS's president list PWOS's assets in an effort to avoid acquiring hidden liabilities. But in an effort to make sure that PWOS's customer base, customer list, and goodwill were not interpreted to be excluded by the list, Moreco shot itself in the foot by ending the list with a statement that the list was not exclusive. Moreco never used the tanks on Mexico Feed's property, and never knew of their existence until the EPA brought it to their attention.
Moreco ran PWOS's collection network much the same way as before with many of the same employees, collection routes and trucks, but the end point of its collections was its own facility. There was no continuity of shareholders or directors; PWOS president Pierce's son was hired by Moreco to run the daily operation of a portion of the PWOS network.
Ultimately, the EPA inspected the tanks on the Mexico Feed property, found they contained high concentrations of PCBs, cleaned up the site, and sued Mexico Feed and its president as owners of the site (the land), PWOS and its president as owners and operators of the site (the tanks), and Moreco as the corporate successor to PWOS.
The District Court found successor liability, but the Eighth Circuit saw it differently. The appellate court noted that the successor corporation did not consist merely of the assets of the predecessor, but was a larger, pre-existing company that utilized the assets it purchased to service one of its existing re-refineries. It was a competitor of PWOS. Moreover, the court noted that it had no knowledge of the offending tanks nor had PWOS been identified as a potentially responsible party under CERCLA; this lack of knowledge was not a case of willful blindness. Thus, the Eighth Circuit concluded that there was not substantial continuation.
The Appellate Court's analysis in Mexico Feed is somewhat problematical in its seeming acceptance of notice as an element and because there was such an identity of activity between the two companies. The more important *480 factor in letting Moreco off the hook would appear to be its effort, although "inartful" (as the appellate court put it), to avoid taking liabilities with its purchase of assets. It was not as though Moreco bought an operation and continued to utilize the four storage tanks. Purchase of storage tanks was not its primary objective. Moreco wanted the assets listed so that it would know what it was purchasing, and the four storage tanks were not listed. The asset purchase in this case was considerably different from the circumstances surrounding the asset purchase in Mozingo. Mexico Feed's conclusion that there was an insufficient showing to satisfy the "substantial continuation" test for Moreco's liability as a successor while not totally indefensible, is a close call, and probably reflects the Court's sense of fairness under the circumstances, particularly since Moreco did not utilize the tanks and had attempted to list exactly what it was purchasing. Knowledge in this case concerned what assets Moreco was purchasing and not that it was engaged in the same practices that led to the contamination from the tanks regardless of whether it knew the leaking oil contained hazardous substances. If Moreco had purchased and used the storage tanks as PWOS had, even though it had no knowledge that there was heavy PCB residue in the tanks until the EPA discovered it, the analysis could have been different, and liability would have attached.
Thus, it can be seen at this point that the "substantial continuity" or "continuity of enterprise" theory is an appropriate test for successor liability in CERCLA cases, that it should be interpreted in light of the objectives of CERCLA, and that resolution of the issue depends on a thoughtful analysis of the facts in each case.
Now, a review of the facts in some other cases may be helpful.

C. Fact Patterns in Other Successor Liability Cases
The R & R relied on primarily two cases: Louisiana Pacific Corp. v. Asarco Inc., 909 F.2d 1260 (9th Cir.1990) and Oner II, Inc. v. United States Environmental Protection Agency, 597 F.2d 184 (9th Cir.1979).
In Louisiana-Pacific Corp. v. Asarco, Inc., 909 F.2d 1260 (9th Cir.1990), Asarco's copper smelting operations produced a rocklike by-product called "slag." Industrial Mineral Products (IMP) marketed the slag for Asarco from the early 1970s until March 1985 when the copper smelter ceased operations. The slag was used as ballast to stabilize the ground at log sort yards. Nine months after IMP stopped selling the slag, it sold substantially all its assets to L-Bar Products, Inc. L-Bar did not continue IMP's slag business.
Louisiana-Pacific and Port of Tacoma sued Asarco for clean-up costs associated with heavy metals released from the slag into the soil as a result of reaction with acidic wood-waste in the log-sort yards. Asarco brought third-party claims against L-Bar and others for contribution or indemnity; L-Bar was sued as a successor to IMP, an assertion that L-Bar disputed.
The court concluded that the continuing business exception did not apply in L-Bar's circumstances. The Court did not discuss the factors that a court may consider in determining whether or not there is successor liability under the "continuing business" or "substantial continuation" exception. It simply reviewed its decision in Oner II, Inc. v. United States Environmental Protection Agency, 597 F.2d 184 (9th Cir.1979) and distinguished it from L-Bar's circumstances. The most important consideration for the Court was that L-Bar did not continue the slag business, but it also noted that L-Bar had no actual notice of IMP's potential CERCLA liability. It concluded that it need not, therefore, decide whether to adopt the continuing business enterprise exception in CERCLA cases. Id. 1265-66. This would seem to be a fair result under CERCLA, which seeks to put the burden of clean-up costs upon the parties responsible for creating or maintaining the hazardous condition, given the fact that L-Bar did not continue the operations that led to the deposit of the heavy metals. The Court's observation that IMP had not been identified as a potentially responsible party would seem to be relevant to a consideration of another exception, that *481 is, for example, whether L-Bar, knowing of the liability, took the business with an implied assumption of that liability. The notice reference in any event contains no analysis of the propriety of an actual notice requirement in CERCLA cases and cannot be viewed as binding on that issue. Louisiana-Pacific does nothing to assist the decision in PACCAR's case, except to highlight a prominent distinguishing feature between PACCAR and L-Bar, that PACCAR did continue with the same activity as its predecessor.
Oner II, Inc. v. U.S. Environmental Protection Agency, 597 F.2d 184 (9th Cir.1979), involved violations of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA). Oner II observed:
The EPA's authority to extend liability to successor corporations stems from the purpose of the statute it administers, which is to regulate pesticides to protect the national environment.... The agency may pursue the objectives of the Act by imposing successor liability where it will facilitate enforcement of the Act.
597 F.2d at 186. The principle of extension of successor liability in light of the statute being administered is harmonious with the jurisprudence of successor liability under CERCLA.
The facts in Oner II begin with Del Chemical Corp, which sold registered pesticides. Following an inspection and analysis of samples, Del was charged on January 23, 1976 by the EPA with violations of FIFRA and recommended a $20,600 fine. Del began a financial decline between the inspection and complaint when its owner was convicted of bribery and income tax evasion and imprisoned. Del's sales manager, Saylor, took over as president, but the decline continued. On March 1, 1976 with assistance from Saylor, three persons formed Oner II to acquire Del's assets. Oner II agreed to assume all of Del's outstanding trade liabilities, but no mention was made of assuming liability for the $20,600 fine. Saylor became president of ONER II, but owned no stock, and Del was left as a corporate shell.
The EPA then amended its complaint to add ONER II and Saylor to its action against Del. The Court concluded concerning ONER II's successor liability:
Oner II had notice of the outstanding debt to the EPA since Saylor served as president of both Del and Oner II. Oner II was formed to continue distributing pesticides, and in Saylor's case maintained the same personnel in a responsible position. Oner II was engaged in the business of distributing pesticides and was thus subject to sanctions by the agency, and we think the sanctions were properly imposed upon it by reason of its having succeeded to operations found to have been conducted in violation of the Act.
597 F.2d at 186-87. The Court does not discuss the "substantial continuation" theory of extending successor liability, but this exception would fit these circumstances. The fact that Oner II continued in the same business as Del, which activity had previously led to the fine is an important factor and contrasts with the situation in Louisiana-Pacific. The fact that Saylor had to have known of the fine but failed to acknowledge it in the asset transfer, whether from willful blindness or fraud or innocent forgetfulness, is simply one other consideration or exception to the general rule that rendered Oner II's liability for the fine appropriate.
Comparing PACCAR's situation with Oner II's, the businesses in each case were continuations of the predecessors. This was an important factor in both Oner II and Louisiana-Pacific, and may be said to be a decisive factor in each case. Similarly, in Mexico Feed, Moreco did not create nor continue the activity of storing contaminated oil in the four tanks in Mexico Feed's field. Mozingo presented a strong basis for liability on the substantial continuation of the business enterprise. Moreover, in the context of product liability law, the theory is that the manufacturer is the best party to bear the burden of the harm caused by defective products, and viewed through this prism, successor liability under the facts was appropriate. In the labor law context, the succeeding corporation may not close its eyes to problems and avoid liability, it has certain duties under the law.

*482 D. PACCAR's Successor Liability

Having concluded that the substantial continuity test for successor liability is appropriate in CERCLA cases and concluding that the test will foster the broad remedial purposes of CERCLA and especially to place response costs upon those responsible for creating or maintaining the hazardous condition, PACCAR's circumstances will now be reviewed to determine whether it is subject to successor liability.
There is no dispute over the basic facts of PACCAR's purchase of the business and assets of Commercial Ship Repair Company on June 1, 1953, nor that between 1953 and 1959 PACCAR operated the Eagle Harbor shipyard doing the same kind of business, using the same name, at the same location, for many of the same customers, and using many of the same assets, managers, executives and employees previously used by CSR and other predecessors at the site. It was such activity at the Shipyard, as noted by the Magistrate, that resulted in the deposit of toxic substances from the marine painting operations and which have now collected in high concentrations in the West Harbor Operable Unit of Eagle Harbor. Thus it appears that many of the factors that are to be considered under the "substantial continuity" theory are satisfied in this case.
Of course there was no notice of potential liability for the contamination of the harbor from the Shipyard enterprise. But CERCLA was enacted to remediate sites contaminated with hazardous waste from past practices. The idea that a successor must have knowledge of a potential for CERCLA liability before liability may attach to it, is illogical considering CERCLA's policies of strict liability and retroactive liability. As stated in United States v. Shell Oil Co., 605 F.Supp. 1064, 1072 (D.Colo.1985), CERCLA
is by its very nature backward looking. Many of the human acts that have caused the pollution already had taken place before its enactment; physical and chemical processes are at their pernicious work, carrying destructive forces into the future.
CERCLA is unique in its approach to dealing with problems and may only be compared in the most general way to other areas of the law such as labor and product liability.
Given the strong connections here between the predecessors and PACCAR's activity and the other factors recited, PACCAR's circumstances satisfy the "substantial continuity" test, particularly in light of CERCLA's purposes.
PACCAR is the successor to all prior operators of the Shipyard. It is clear that PACCAR is the successor to CSR under the above rationale. There are close connections between Hall Brothers and Winslow Marine and then to PACCAR. The enterprise continued through the ownership periods for these three entities. Benefits flowed to them all from the ability to release contaminants without care or cost. Having enjoyed the benefits, it is not without justification under CERCLA that the parties now bear the responsibility of clean-up costs. While it may be argued that the benefits of clean-up may be enjoyed by the taxpayers at large and that PACCAR should not have such a heavy burden, the statute is designed to place the burden on the polluters. PACCAR may ultimately pass its clean-up costs along to that narrow segment of the public with whom it does business and may argue that spreading the costs more broadly to the taxpayers may be a better solution. Such passing along of costs tends to fan out to areas much further than may be immediately apparent. This philosophical point is for the legislative branch to debate and determine, however; the decision on where to place the burden has already been made, and it is not for the Court to alter CERCLA's comprehensive scheme.

E. Conclusion
The United States' objection to the Report and Recommendation on the issue of PACCAR's successor liability is sustained, and the United States' motion for partial summary judgment against PACCAR on successor liability is granted.

II. Operator Liability

A. Rule
The first step in this analysis is to determine the standard to apply in assessing *483 whether the United States can be held liable as an "operator" of the Shipyard based on allegations of certain activity by the United States Navy during World War II. CERCLA simply defines an owner or operator as "any person owning or operating such facility. ..." 42 U.S.C. § 9601(20)(A). While this tautological definition is not very enlightening, still, as the Seventh Circuit observed, "The circularity strongly implies, however, that the statutory terms have their ordinary meanings rather than unusual or technical meanings." Hines Lumber Co. v. Vulcan Materials Co., 861 F.2d 155, 156 (7th Cir. 1988).
The State and PACCAR cite Kaiser Aluminum v. Catellus Development Corp., 976 F.2d 1338 (9th Cir.1992) for the applicable standard to assess liability as an "operator": operator liability attaches "if the defendant had authority to control the cause of the contamination at the time the hazardous substances were released into the environment." Kaiser addressed the issue of whether there were circumstances present to render a contractor who did grading and excavating at a development site liable as an "operator." The Court in Kaiser cited Edward Hines Lumber Co. v. Vulcan Materials Co., 861 F.2d 155 (7th Cir.1988) as it compared the circumstances of the case before it with that of the contractor in Hines:
... it is clear from the court's analysis in Hines that the contractor was not liable as an "operator" because although he designed and built the wood treatment plant, he had no authority to control the day-to-day operation of the plant after it was built; and it was during the operation of the plant that the hazardous materials were released.
We read Hines as reiterating the well-settled rule that "operator" liability under section 9607(a)(2) only attaches if the defendant had authority to control the cause of the contamination at the time the hazardous substances were released into the environment.
Kaiser, 976 F.2d at 1341.
The United States cites Long Beach Unified Sch. Dist. v. Dorothy B. Godwin California Living Trust, 32 F.3d 1364, 1367 (9th Cir.1994):
To be an operator of a hazardous waste facility, a party must do more than stand by and fail to prevent the contamination. It must play an active role in running the facility, typically involving hands-on, day-to-day participation in the facility's management.
While the parties distinguish the rules in these cases  Kaiser "authority to control" test, and Long Beach "actual control" standard, this is an exceedingly fine line that is somewhat difficult to discern from the cases. In Kaiser, the contractor was held to be an operator, because his excavation and grading produced the contamination on uncontaminated ground. In Hines, the contrasting case in Kaiser, the builder of the wood treatment plant was not liable as an operator because he had no authority to control the day-to-day operation of the plant after it was built. In neither of these cases did the result turn on unexercised "authority"; it turned upon what the alleged operator actually did. Moreover, it should be noted that Judge Kozinski sat on the panel that decided Kaiser and wrote the decision in Long Beach; these two cases are harmonious and not in conflict. Active involvement in the activity that produces the contamination is what is required for "operator" liability.

B. United States Navy's Activity at Eagle Harbor
The Shipyard activities that led to contamination of the harbor were painting (paint to protect wood and steel surfaces contained mercury, copper, arsenic, lead, and zinc), ship surface preparation work, disposal of ship surface preparation and painting wastes, and maintenance of shipyard facilities.
The State and PACCAR argue that it is appropriate to impose operator liability on the United States, which they contend supervised shipyard production through the placement of on-site supervisors and inspectors, participated in managing and supervising the workers, provided financing and equipment for use at the facility, directly controlled costs and was fully aware that the generation *484 of hazardous waste was inherent in the shipyard operations.
The State and PACCAR argue that the situation during the war years at the Shipyard was analogous to that in FMC v. United States Department of Commerce, 786 F.Supp. 471 (E.D.Pa.1992); FMC Corp. v. U.S. Depart. of Commerce, 29 F.3d 833 (3rd Cir.1994) where rayon produced at the FMC plant (whose predecessor during the war years was American Viscose) was considered critical to the war effort as it was an essential component of tires for automobiles and aircraft and the United States had lost 90% of its crude rubber supply. 786 F.Supp. at 472. In FMC, the Government financed installation of new equipment, leased it to American Viscose, assigned personnel to facilitate and expedite plant expansion, participated in obtaining and retaining personnel to work at the facility, paid some salaries, resolved labor disputes and problems with worker productivity.
The United States agrees that certain federal agencies had negotiated contracts with the Shipyard; only one such contract has been located, however. The contracts were for ship repair and for building minesweepers and small harbor tugs under "cost-plus-fixed-fee" contracts during the war. Such contracts have been described as follows:
When the government enters into a cost-plus-fixed-fee contract ... the government engages the knowledge, the skill, the judgment and the capabilities of the contractor ... The contracting officer's function is not that of a boss over the contractor, "telling him what he can and cannot buy, whom he shall employ and how much he is allowed to pay employees."
J.A. Ross & Co., ASBCA No. 2326, 6 Cont. Cas.Fed. (CCH) ¶ 61,801, at 52,497 (1955). The dislocations from the war efforts that brought about more Government activities with respect to certain private business lead the FMC court to the conclusion that the Government had "operator" status as to American Viscose.
FMC was reargued before an en banc panel of twelve judges, and four judges dissented from the majority opinion. Significantly, FMC applied what they termed the "actual control" test in determining whether operator liability should be imposed on one corporation for the acts of a related corporation, citing its opinion in Lansford-Coaldale Joint Water Auth. v. Tonolli Corp., 4 F.3d 1209 (3d Cir.1993). Under the "actual control" test, a corporation will be liable for the environmental violations of another corporation if there is evidence that it exercised "substantial control" over the other corporation, which requires, at a minimum, "active involvement in the activities" of the other corporation. The Court found this related corporation case instructive concerning the Government's relationship with the private corporation. The majority concluded that the Government had substantial control over FMC because (1) FMC's predecessor during the war years would not have been manufacturing high tenacity rayon but for the Government's direction; the Government also pressured the company to increase production, thereby increasing the amount of resulting toxic waste; (2) the company was subject to Government regulations, on-site inspections, and the possibility of seizure; (3) the Government built plants supplying raw materials to American Viscose; (4) the Government supplied machinery and equipment for use during the manufacturing process; and (5) the Government controlled product marketing and price.
The FMC dissent parted company with the majority, one stating that "when Congress used the word "operator," it did not have in mind a governmental entity whose economic interest and involvement in a production facility was limited to that of a regulator and ultimate consumer." The main dissent elaborated upon this statement. While the majority found it right and proper to view CERCLA liability as a cost of war placed on society as a whole, the dissent did not believe that Congress intended to waive the United States' sovereign immunity for the "unique governmental activity" of "coordinating and steering the country's private industries to insure that they would produce the war supplies *485 necessary to mount the country's military operations." The dissent also notes that the
Supreme Court itself has recognized that for the most part the government did not choose to "operate" private industry in the war effort. See Lichter v. United States, 334 U.S. 742, 766, 68 S.Ct. 1294, 1307, 92 L.Ed. 1694 (1948). (Congress chose not to "convert[] the nation in effect into a totalitarian state" by operating all domestic industry and instead carefully regulated to "reach[] unequalled productive capacity and yet retain[] the maximum of individual freedom consistent with a general mobilization of effort".)
29 F.3d at 852. Lichter provides important background information for what the Government was trying to accomplish during World War II and is significant in undermining a contention that CERCLA operator liability would be appropriate for the United States for having utilized the Shipyard services at Eagle Harbor during those years.
FMC applied the "actual control" test, a tool for analysis that compliments this Court's conclusion that active involvement in the activity that causes the contamination is what is required for "operator" status. First, the FMC situation is distinguishable from the Shipyard circumstances herein: (1) there is no discussion of the role of the War Production Board or the Defense Plant Corporation, entities that figured prominently in the FMC case; (2) the Government did not direct the Shipyard to do different work than it would ordinarily have done; (3) some items relied on by the Court related to unexercised "authority" to do something, such as seizure of the plant if its orders were not followed; (4) nationwide regulations affecting all industries were also relied on. Application of the "actual control" test in FMC appears to have been somewhat tainted by reliance on elements evidencing unexercised "authority to control" certain aspects of the business.
At the Eagle Harbor Shipyard, there is no dispute that Winslow Marine conducted its operations, and generated and handled wastes in the same ways as it had before the war. The Federal government did not require any changes in these procedures nor did it conduct any of the work. The Government inspectors and accountants had no responsibility for directing activities that led to the deposit of the wastes. The primary concern of the inspectors and accountants was efficiency and cost control. As any customer would, the Government wanted value for its dollars spent, particularly since a war was on. None of the activities cited by the State or PACCAR relate to actually controlling the activity that produced the pollution.
The Report and Recommendation's citation of two documents merely highlight the focus of the Government in controlling costs: From the document cited by the State and PACCAR  "Inasmuch as the great bulk of the contracts were cost-plus-fixed-fee, the Resident Offices were definitely instructed to work with the Cost Inspection Service and actually to control costs,  both direct and indirect." (Tab O, Decl. of Robert M. Weaver, Wartime History of the Supervisor of Shipbuilding, United States Navy, p. 10 cited in R & R p. 11.) From a document cited by the United States  "One of the major problems in this field [inspecting shipyard costs and services] was the difficulty of supervising efficient and economic contract industrial operations of cost-plus-fixed-fee Naval contractors without exercising actual industrial control." Id. These documents do not create a genuine issue of material fact. They both speak of efforts to control costs; one says "actually to control costs" while the other indicates there is no desire to exercise actual industrial control. The documents are harmonious between themselves, particularly when considered against Lichter.
Viewing the totality of the evidence depicting the circumstances as a whole at the Shipyard during the war years, the United States cannot be considered to have been actively involved in the day-to-day activity that produced the contamination. The substantial import of the record before the Court is that the United States did not control the operations of the Shipyard such that it became an "operator" under CERCLA.

C. Conclusion
The United States' objection to the Report and Recommendation on the issue of its "operator" liability is sustained, and the United States' motion for partial summary judgment *486 on the issue of its "operator" liability is granted.
Accordingly, it is hereby
ORDERED: The United States' objections to the Report and Recommendation are SUSTAINED and the United States' summary judgment motions on the issues of PACCAR's successor liability and the United States' status as an "operator" at the Shipyard are GRANTED.