# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-CA-01825-SCT

*WILLIAM H. GREGORY, DECEASED, BY AND
THROUGH HIS CO-EXECUTORS, WILLIAM H.
GREGORY, JR., AND ROBERT HOOD GREGORY;
AND BETTY SUE GREGORY*

*v.*

*CENTRAL SECURITY LIFE INSURANCE
COMPANY, SUCCESSOR IN INTEREST TO
ANDREW JACKSON LIFE INSURANCE
COMPANY*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/15/2005 |
| TRIAL JUDGE: | HON. ANDREW K. HOWORTH |
| COURT FROM WHICH APPEALED: | CHICKASAW COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | WILLIAM R. COUCH |
| | RICHARD JOSEPH LAJAUNIE |
| | GRANT M. FOX |
| ATTORNEY FOR APPELLEE: | THOMAS WICKER |
| NATURE OF THE CASE: | CIVIL - INSURANCE |
| DISPOSITION: | AFFIRMED - 04/05/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE SMITH, C.J., CARLSON AND RANDOLPH, JJ.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

### STATEMENT OF THE CASE

¶1.     This appeal arises out of a dispute over two insurance policies purchased by William

and Betty Sue Gregory ("the Gregorys"). The Gregorys seek to hold liable Central Security

Life Insurance Company ("Central Security"), which purchased the assets of an the insolvent

insurer, Andrew Jackson Life Insurance Company ("Andrew Jackson"), for the alleged tortious activities of Andrew Jackson.

¶2. On January 5, 1984, the Gregorys were sold two life insurance policies by an agent of Andrew Jackson, Earl Wayne Stevens ("Stevens"). Stevens is not and has never been an employee or agent of Central Security. The policy listed Kathy Etheridge ("Etheridge"), the Gregorys' daughter, as both the owner and beneficiary of the policies. The Gregorys claim Stevens represented to them that these policies were "vanishing premium" policies. The vanishing premium concept is that after a certain period of time the policy will accumulate value sufficient to pay the premiums. The Gregorys claim this was a strong selling point for them and that when they purchased the policies, they understood they would have to pay premiums of $9,000 a year for five to seven years and then the premium payments would "vanish." However, the record reflects that on May 10, 1989, Etheridge (at the Gregorys' home address), received a letter from Andrew Jackson stating interest rates had dropped since the policy was purchased, and that in order to sustain the Gregorys' coverage, additional premiums would have to be paid.

¶3. Subsequently, Andrew Jackson became insolvent and was liquidated. Central Security entered into an Agreement for Assumption Reinsurance ("Agreement") with the National Organization of Life and Health Insurance Guaranty Associations ("NOLHGA") to perform certain contractual obligations of Andrew Jackson arising on or after January 1, 1993. These "Covered Obligations" included: "[T]he *obligations* of such *guaranty association* for the performance of the contractual obligations of AJL, which pursuant to its state governing law,

2

as the result of the insolvency of AJL, have arisen in connection with the insurance policies and annuities of AJL." (emphasis added).

¶4. In 2001, the Gregorys received a notice from Central Security that stated that in order to continue their policies, the Gregorys would be required to pay additional premiums as a result of declining interest rates. In 2002, the Gregorys filed a Complaint against Central Security, as successor in interest to Andrew Jackson, and Stevens. In their Complaint, the Gregorys averred that Stevens individually made false and misleading representations to them in a deliberate attempt to induce the Gregorys to purchase the policies. The Gregorys claimed all defendants engaged in false and misleading sales representations. Further, the Gregorys alleged in their Complaint the following:

> (1) All Defendants fraudulently misrepresented the performance of their policies; (2) All Defendants fraudulently concealed material facts regarding the vanishing premium concept; (3) Andrew Jackson intentionally failed to properly train and supervise its agents; (4) Central Security knew, or reasonably should have known at the time it assumed the Gregorys' insurance policy, of the fraudulent and misleading representations, but has continually failed to take any action to correct the misrepresentations or to compensate the Gregorys; (5) Andrew Jackson and Central Security engaged in a deliberate course of conduct which concealed from the Gregorys the nature and extent of the deceptive sales practices; (6) That the actions of Andrew Jackson and Central Security constituted a breach of contract, negligent misrepresentation, fraud, fraudulent representation, fraudulent inducement, unjust enrichment, and/or fraudulent concealment.

¶5. The Gregorys also demanded judgment against Central Security and Stevens jointly and severally in a total sum to include punitive damages and all costs of the action. Although they alleged several issues in their Complaint, the only conceivable claim the Gregorys could have against *Central Security* is for breach of contract.

3

¶6. Stevens filed an Answer, individually, claiming any actions he took in selling the policies were in connection with the representation, solicitation, sale or service of products of Andrew Jackson solely while he was acting in the course and scope of his employment as an agent of Andrew Jackson. Stevens claimed he in good faith relied on information provided to him by Andrew Jackson and that if any statements he made were incorrect or false, Stevens was not aware of this and reasonably believed them to be true and correct. Stevens asserted various defenses and demanded that the Complaint against him be dismissed. Additionally, Central Security filed an Answer and Defenses. Central Security asserted that upon entering the Agreement to assume the policies of Andrew Jackson, it did not assume any liability based on actions or events prior to the date the policies were assumed or any liability arising out of or relating to any act or omission of Andrew Jackson or its agents.

¶7. On November 23, 2004, Central Security filed a Motion to Dismiss or in the alternative, Motion for Summary Judgment. Central Security asserted, inter alia, that its involvement with the policies did not occur until eight years after the issuance of the policies and Central Security had no involvement with the sale or issuance of the policies. Further, Central Security claimed the Complaint should be dismissed pursuant to Mississippi Rules of Civil Procedure 12(b)(6) and 17 for failure to join the real party in interest, Etheridge, the sole owner and beneficiary of the policy. Stevens joined in Central Security's Motion. The Gregorys filed a Response to Central Security's Motion, stating they had standing to bring the action because they purchased the policies and they were the ones to whom the misrepresentations were made.

4

¶8. In 2005, the parties appeared in the Circuit Court of the Second Judicial District of Chickasaw County to argue Central Security's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment. The trial court issued an Order of Summary Judgment for Central Security, finding that Central Security was not responsible for any misrepresentations or omissions of Andrew Jackson and that the Gregorys failed to demonstrate any genuine issue of material fact. The Order of Summary Judgment stated that the cause against Central Security was fully and finally dismissed. The order does not mention Stevens.

¶9. The Gregorys filed a Motion to Reconsider the Order Granting Summary Judgment, to which Central Security filed a Response. The Motion to Reconsider was denied by order of the trial court. It is from the denial of this motion that the Gregorys appeal.

¶10. The Gregorys present the following issues for appeal:

I. Whether the lower court erred in finding, as a matter of law, that Central Security bore no responsibility for any misrepresentations or omissions of Andrew Jackson or its agents.

II. Whether the Gregorys failed to show the existence of any genuine issues of material fact with regard to wrongful conduct including breach of contract, negligent and/or fraudulent misrepresentation, negligence, unjust enrichment and/or fraudulent concealment by Central Security.

¶11. However, the issue for this Court to address is whether the lower court erred in finding, as a matter of law, that Central Security bore no responsibility for any misrepresentations or omissions of Andrew Jackson or its agents, as this was the only issue addressed by the trial court in its Order. Therefore, our analysis is restricted to that issue.

**FACTS OF THE CASE**

5

¶12. On January 5, 1984, the Gregorys purchased two life insurance policies for Betty Sue Gregory.[1] In his deposition, William testified he purchased two, because his wife convinced him the amount of the first policy would not be enough to divide among their children. William stated he was sold these policies by Stevens, who was a long-time friend. William knew Stevens was an agent for Andrew Jackson at the time the policies were sold. William stated that Stevens showed them documents illustrating that they would only be making $9,000 annual payments for five to seven years. William testified he did not have those documents anymore, therefore he was not able to submit them in discovery. The Gregorys designated their daughter, Etheridge, as both the owner and beneficiary of the policies.

¶13. The policies stated that premiums were due for life. The first policy issued stated the annual premium would be $3,730. The second policy stated an annual premium rate of $5,582.50. Further, in both policies, the section entitled "Payment of Premiums," states "Premiums are due annually in advance. They are payable (a) for the number of years shown on page 3; and (b) while the insured is alive. . . ." The number of years shown on page 3 of both policies reveals, "Number of Years Payable: Life." Nowhere in the policies does it state the premiums will "vanish" or that William will no longer have to make payments after five to seven years.

¶14. William testified he received documents and annual reports at his home, which were addressed to Etheridge, from Andrew Jackson and Central Security. William testified he kept the documents in a file for Etheridge, and that at times, William and Etheridge did discuss the policies. However, William testified he did not read the policies, nor any documentation

---

[1] A third policy was purchased, but that policy is not at issue in this case.

that he received from Andrew Jackson. William testified that at the end of seven years, he no longer heard from Stevens and stopped making payments.

¶15. Subsequently, Andrew Jackson became insolvent. In 1992, the Chancery Court for the First Judicial District of Hinds County entered an Order of Rehabilitation, naming the Insurance Commissioner for the State of Mississippi as Rehabilitator. On March 26, 1993, an Order of Liquidation was entered by the chancery court.

¶16. However, prior to the Order of Liquidation, on March 3, 1993, Central Security entered into the Agreement concerning Andrew Jackson. In this Agreement, Central Security assumed responsibility for the "Covered Obligations" of Andrew Jackson.

¶17. A Policy Amendment was sent by Central Security to all Andrew Jackson policyholders which was to be attached to and made part of the existing Andrew Jackson policy. The Policy Amendment stated, inter alia, that "[w]henever the name Andrew Jackson Life Insurance Company is used in the policy, it is hereby amended and the name Central Security Life Insurance Company is hereby substituted (subject to the conditions below)." The Policy Amendment listed these conditions: "CSL has not assumed and is therefore not liable for any other risk, obligation, indebtedness, or liability of [Andrew Jackson], [National Organization of Life and Health Insurance Guaranty Associations], or any other party."

¶18. In 2001, the Gregorys received notice from Central Security that, due to declining interest rates, they would need to make additional premium payments. William testified that he contacted Central Security about the need for additional premium payments. The Gregorys began making premium and lump sum payments on their first policy. In 2003, the Gregorys began doing same for their second policy. After contacting Central Security and being

7

informed interest rates had gone down, and he would need to pay additional premiums, William stated he contacted an attorney. William testified that he continued to pay the premiums so the policy would not lapse, but because of his age, it was very difficult to do so. He also said, had he known the premiums would not vanish, he would not have purchased that policy. William testified he also called the Insurance Commissioner's office when he received the notice he would have to pay the additional premiums. William stated the Insurance Commissioner's office told him he would have to fill out a complaint form. William testified he did not fill out the complaint form, but instead went to an attorney.

## STANDARD OF REVIEW

¶19.    "We employ a de novo standard of review of a trial court's grant or denial of summary judgment and, examine all the evidentiary matters before it, [such as] admissions in pleadings, answers to interrogatories, depositions, affidavits, etc." *Hurdle v. Holloway*, 848 So. 2d 183, 185 (Miss. 2003)). Furthermore, "[t]he evidence must be viewed in the light most favorable to the party against whom the motion has been made. If, in this view, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, summary judgment should be entered in his favor. In addition, the burden of demonstrating that no genuine issue of fact exists is on the moving party." *Moore ex rel*. *Moore v. Mem'l Hosp. of Gulfport*, 825 So. 2d 658, 663 (Miss. 2002) (citation omitted).

## ANALYSIS

**I. Whether the lower court erred in finding, as a matter of law, that Central Security bore no responsibility for any misrepresentations or omissions of Andrew Jackson or its agents.**

8

¶20. The Gregorys assert that Central Security assumed responsibility for the misrepresentations of Andrew Jackson when Central Security issued the Policy Amendment stating that the name Central Security was to be substituted for the name Andrew Jackson anywhere it appeared in the policy. The Gregorys argue that Central Security held itself out to policyholders as continuing the same coverage issued by Andrew Jackson.

¶21. The Gregorys assert that Central Security meets the requirement of successor liability through the "product-line theory" recognized by this Court in *Huff v. Shopsmith,* 786 So. 2d 383, CCH Prod. Liab. Rep. P16, 099 (Miss. 2001).

¶22. "The product line theory is a deviation from the traditional rule 'based largely on the idea that the successor corporation is, like the predecessor, in a position to assume the risk-spreading role assigned to the manufacturer of a product by strict liability theory.'" *Paradise Corp. v. Amerihost Development, Inc.,* 848 So. 2d 177, 180 (Miss. 2003) (quoting *Mozingo v. Correct Mfg. Corp.,* 752 F.2d 168, 174 (5th Cir. 1985)).

¶23. Central Security asserts it cannot be held liable under the product-line theory as this case is not one of strict liability or personal injury and the product in this case is an insurance contract, governed by contract law. Furthermore, Central Security argues that the insurance contract is not defective. Central Security further argues it does not meet the requirements set out in *Huff,* as "Central Security is a completely separate entity that assumed certain *statutory obligations* not of Andrew Jackson, but of the Mississippi [Life and Health Insurance Guaranty] Association."

¶24. The crux of the Gregorys' argument is that Central Security held itself out to the public as a mere continuation when it sent the Policy Amendment to policyholders stating Central Security's name should be substituted for the name Andrew Jackson.

¶25. Central Security responds by stating it did not assume any liability of Andrew Jackson, but assumed only the limited statutory obligations of the guaranty associations, which will be discussed *infra*. Further, Central Security states that the Policy Amendment, as well as the Agreement, disclaimed liability for "any other risk, obligation, indebtedness or liability of AJL, NOHLGA, or any other party."

¶26. This Court finds Central Security does not meet any of the four criteria of the product-line theory as enumerated by this Court in **Huff**. Additionally, the Gregorys put forth no evidence which showed Central Security knew anything about the policy or the procurement of same other than the language of the contract. The policy, which William testified he did not read, unequivocally stated premiums would be due for life. Nowhere in the policy is there language which states premiums would vanish or that they would be due for only five to seven years. "Our law requires this Court to accept the plain meaning of a contract as the intent of the parties where no ambiguity exists." **A&F Props., LLC v. Madison County Bd. of Supervisors,** 933 So. 2d 296, 301 (Miss. 2006).

¶27. Central Security was not liable for the acts or omissions of Andrew Jackson or Stevens, as pursuant to statute, Central Security did not assume any obligations outside of the Covered Obligations. In an amicus curiae brief submitted by the Mississippi Life and Health Insurance and Guaranty Association ("MLHGA") and NOLHGA, these organizations state the following:

10

Pursuant to the Agreement for Assumption Reinsurance between NOLHGA and Participating Life and Health Insurance Guaranty Associations and Central Life Insurance Company concerning Andrew Jackson Life Insurance Company in Liquidation, Central Security assumed only the statutory obligations of MLHGA to policyholders of Andrew Jackson Life Insurance under the express terms of the Assumption Agreement. . . . [T]he statutory obligations of MLHGA include certain of the policy contract obligations of an insolvent insurer, *but do not include any extra-contractual obligations,* such as liability for the tortious conduct of the insolvent insurer. Therefore, since MLHGA could not transfer more obligations than it had, neither Central Security nor any insurer could assume liability for the insolvent insurer's torts.

(emphasis added).

¶28. In Title 83, Chapter 23 of Mississippi Code Annotated, the Legislature provided protection for policyholders against insolvent insurers, as well as set forth guidelines for guaranty associations and companies which subsume insolvent insurers. Miss. Code Ann. § 83-23-203(1) (Rev. 1999) states:

The purpose of this article is to protect, subject to certain limitations, the persons specified in Section 83-23-205(1) against failure in the performance of contractual obligations, under life and health insurance policies and annuity contracts specified in Section 83-23-205(2), because of the impairment or insolvency of the member insurer that issued the policies or contracts.

Further, Miss. Code Ann. § 83-23-205(2)(b)(x)(emphasis added) holds,

(b) This article shall not provide coverage for:
. . . .
    (x) *An obligation that does not arise under the express written terms of the policy or contract* issued by the insurer to the contract owner or policy owner, including without limitation:
    1. Claims based on marketing materials;
    2. Claims based on side letters, riders or other documents that were issued by the insurer without meeting applicable policy form filing or approval requirements;
    3. *Misrepresentations of or regarding policy benefits;*
    4. *Extra-contractual claims;* or
    5. A claim for penalties or consequential or incidental damages; and. . . .

11

¶29.    Central Security also asserted that Section 3.2 of the Agreement entitled it to the defenses provided for the guaranty associations pursuant to Miss. Code Ann. § 83-23-231. Miss. Code Ann. § 83-23-231 states:

> There shall be no liability on the part of and no cause of action of any nature shall arise against any member insurer or its agents or employees, the association or its agents or employees, members of the board of directors, or the commissioner or his representatives, for any action or omission by them in the performance of their powers and duties under this article. Such immunity shall extend to the participation in any organization of one or more other state associations of similar purposes and to any such organization and its agents or employees.

¶30.    "Whatever the Legislature says in the text of the statute is considered the best evidence of the legislative intent." *MDOT v. Allred,* 928 So. 2d 152, 155 (Miss. 2006). Further, "[i]t is our duty to interpret the statutes enacted by the Legislature, and to neither broaden [n]or restrict the legislative act." *Id.* at 156. The Legislature has clearly provided safeguards for the insured, as well as the guaranty associations and companies which subsume insolvent insurance companies, and we are bound to follow the statute. This Court agrees with NOLHGA and MLHGA that allowing claims such as the Gregorys'

> to be maintained against insurers that assume policies from life and health insurance guaranty associations for the purpose of protecting policyholders would have serious practical consequences. The ability of guaranty associations to fulfill their statutory obligations in the most efficient manner and in the best interest of policyholders would become significantly more difficult and expensive if not impossible in certain cases.

**CONCLUSION**

¶31.    The Gregorys' claims fail as Central Security, under the Agreement and pursuant to statute, assumed no liability caused by any alleged fraudulent misrepresentations of Andrew

Jackson or its agents. The trial court did not err in granting summary judgment in favor of Central Security.

¶32.    **AFFIRMED**.

      **SMITH, C.J., WALLER AND COBB, P.JJ., CARLSON AND DICKINSON, JJ., CONCUR.    EASLEY AND GRAVES, JJ., DISSENT WITHOUT SEPARATE WRITTEN OPINION.  DIAZ, J., NOT PARTICIPATING.**